**METRO–GOLDWYN–MAYER, INC.,**
Plaintiff,

v.

**TRANSAMERICA CORPORATION,**
**Transamerica Financial Corporation,**
**Tracy Investment Company and Kleiner-Bell & Co., Inc., Defendants.**

**No. 69 Civ. 3296.**

United States District Court
S. D. New York.
Aug. 8, 1969.

Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; Joseph H. Flom, Barry H. Garfinkel, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for defendants; Arthur J. Goldberg, Martin Kleinbard, New York City, of counsel.

## OPINION

TENNEY, District Judge.

Metro-Goldwyn-Mayer, Inc. (hereinafter referred to as "MGM"), a Delaware corporation having its principal place of business in New York, has moved herein for leave to file a supplemental complaint, pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, directed against Tracy Investment Company and Kleiner-Bell & Co., Inc., to reflect the most recent developments in its controversy with defendant Tracy Investment Company and others growing out of the efforts by Tracy Investment Company (hereinafter referred to as "Tracy"), a Nevada corporation having its principal place of business in Las Vegas, to acquire working control of MGM through a cash tender of $35 per share to MGM stockholders. The shares of MGM involved herein are listed on the New York Stock Exchange. MGM has brought action to enjoin the tender offers, and, based on its supplemental complaint, now seeks the equitable relief of a preliminary injunction enjoining the above-mentioned defendants from proceeding with such offers. MGM further seeks discovery with respect to matters set forth in its amended complaint. Before consideration of the merits and applicable law, a brief resume of this short but eventful controversy would appear to be in order.

On July 23, 1969, defendant Tracy published in The New York Times and

the Wall Street Journal a tender offer to purchase 1,000,000 shares of the common stock of MGM. The financing for this tender offer was to be supplied in major part by a loan of $30,000,000 from defendant Transamerica Financial Corporation (hereinafter referred to as "Transamerica Financial"). The offer provided that the last day upon which the shares could be tendered was to be August 4, 1969, and the final day for withdrawal July 29th, but on July 26, 1969 the invitation was extended to August 8th with the last day for withdrawal August 6, 1969. Thereafter, MGM moved in this court for a temporary restraining order and preliminary injunction on the ground that Transamerica Financial was affiliated with United Artists Corporation, a major competitor of MGM, and that the loan arrangement would therefore violate Section 7 of the Clayton Act because Transamerica Financial would thereby obtain substantial influence or control over MGM.

On July 28, 1969, Judge Mansfield of this court granted a temporary restraining order, which order was extended on July 30th, and on August 2, 1969, D.C., 303 F.Supp. 1344 he granted a preliminary injunction enjoining the transaction as then financed, placing certain restrictions upon any refinancing by Transamerica Financial and directing that if Tracy had any present plans for the financing of purchases of the common stock of MGM in excess of the 1,000,000 shares to which it was committed under the tender offer, it disclose such plans to the MGM stockholders, including a statement as to whether or not financing had been obtained to carry them out. Reference is made to the opinion of Judge Mansfield of August 2, 1969 for a more complete recital of the facts leading to the issuance of his order.

As a result of Judge Mansfield's order of August 2, 1969, on August 4, 1969 Tracy filed with the Securities and Exchange Commission Amendment No. 4 relating to its original tender, the tender offer was refinanced and the new arrangements were announced in the newspapers on August 5, 1969. Under these arrangements, Tracy was to obtain $20,000,000 in Eurodollars from Burkhardt & Co. (hereinafter referred to as "Burkhardt"), a German banking institution, and $12,000,000 in Eurodollars from Burston & Texas Commerce Bank Limited (hereinafter referred to as "Burston"), an English banking institution. These loans were both to be secured by pledges of securities in the amount of 150 per cent of the loan principal, with the further provision that part of the collateral might include the shares of MGM purchased pursuant to the tender offer. Furthermore, not more than one-half of the value of the collateral for the Burkhardt loan might consist of shares of an affiliate of Tracy, i. e., International Leisure Corporation (hereinafter referred to as "ILC"), a non-listed security. The amended tender as published on August 5th did not change the provisions regarding the date for withdrawal of shares, i. e., August 6, 1969. On the following day, August 6, 1969, Tracy announced that it would propose to seek an additional 740,000 shares of MGM stock, and in connection therewith Tracy filed an amendment to its previous tender offer, dated August 6, 1969, which revealed that a source of funds for the additional 740,000 shares would be a $30,000,000 Eurodollar loan from Burkhardt & Co. ("second Burkhardt loan"). An advertisement containing the terms of this latest offer appeared in the Wall Street Journal on August 7, 1969.

MGM contends that these offers as announced on August 5 and 6, 1969, violate Regulations G and T promulgated under Section 7 of the Securities Exchange Act of 1934, 12 C.F.R. §§ 220 et seq. and 207 et seq., and that as a result the plan of financing for the tender offers is illegal. It further alleges that the shareholders of MGM who tender their shares in reliance upon these said offers have been and will be misled as to a most material fact—the legality and reliability of the plan to raise the money with which to pay them and that such

omission and misrepresentation violates Sections 14(d) and 14(e) of the Securities Exchange Act of 1934, the so-called "Williams Act". In addition, as heretofore noted, MGM seeks discovery to learn by the use of depositions and records whether defendants Tracy and Kleiner-Bell & Co., Inc., the Dealer-Manager (hereinafter referred to as "Kleiner-Bell") by virtue of their participation in the creation of this illegal financing arrangement have themselves violated Regulation T.

 It seems quite clear that MGM has standing to maintain this action and to seek the injunctive relief requested herein. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968); Glickman v. Schweickart & Co., 242 F.Supp. 670 (S.D.N.Y.1965). Moreover, the provisions of Rule 15(d) of the Federal Rules of Civil Procedure would appear to have been designed for such a case as this, involving a far from static situation and, accordingly, MGM's motion to file a supplemental complaint is granted in the exercise of the Court's discretion and without objection by defendants.

As heretofore stated, it is MGM's contention that the loans to finance the purchase under the tender offer are subject to and violate the provisions of Regulations G and T promulgated under Section 7 of the Securities Exchange Act of 1934, and that as a result the plan of financing for the tender offers is illegal.

The basis for the assertion of illegality is that security loans subject to Regulations T and G, the proceeds of which are to be used to purchase stock, must be secured by collateral five times the value of the loan. Regulation G provides that a lender may not loan for "purpose credit" in excess of the "loan value" of the collateral as prescribed for "margin securities".

The lender may not

"* * * extend or arrange for the extension of any purpose credit [secured in such fashion] in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for registered equity securities in § 207.5 * * * or as determined by the lender in good faith for any collateral other than registered equity securities * * *."

12 C.F.R. § 207.1(c).

"Purpose credit" is defined as:

"Credit which is for the purpose, whether immediate, incidental or ultimate, purchasing or carrying a registered equity security is 'purpose credit', despite any temporary application of funds otherwise." 12 C.F.R. § 207.2(c) (1).

"Registered equity securities" include, *inter alia*, "any equity security which * * * is registered on a national securities exchange." 12 C.F.R. §§ 207.2 (d) and (e).

The maximum "loan value" of any margin security is fixed by Regulation G, 12 C.F.R. § 207.5, at 20 per cent of such security's current market value, or, in other words, as previously noted, secured loans to purchase stock must be secured by collateral five times the value of the loan. Furthermore, a non-listed security such as ILC is not a margin security, and for the purpose of Regulation G has no loan value and may not be considered in calculating whether or not sufficient collateral has been pledged to support a purpose loan. 12 C.F.R. § 207.1(i).

██ However, plaintiff's assertion of illegality cannot be sustained. Nothing contained in the 1934 Act—nor in any of the Regulations promulgated thereunder, including Regulation G—in any way indicates an attempt or intent to regulate the acts of foreign lending institutions. Regulation G provides, in pertinent part:

"207.1. General rule.

(a) *Registration.* Every person who, in the ordinary course of his

business * * * extends or arranges for the extension of a total of fifty thousand dollars ($50,000) or more or has outstanding at any time during the calendar quarter, a total of one hundred thousand dollars ($100,000) or more, in credit, secured directly or indirectly, in whole or in part, by collateral that includes any registered equity securities, unless such person is subject to Part 220 (Regulation T) or Part 221 (Regulation U) of this chapter, is subject to the registration requirements of this paragraph and shall, within 30 days following the end of the calendar quarter during which the person becomes subject to such registration requirements, *register with the Board of Governors of the Federal Reserve System by filing a statement in conformity with the requirements of Federal Reserve Form G–1 with the Federal Reserve Bank of the district in which the principal office of such person is located* * * *." (Emphasis supplied.)

Moreover, the Regulation further provides (207.3(a)):

"Every person who is registered pursuant to § 207.1(a) shall within thirty (30) days following the end of each succeeding calendar quarter file a report on Federal Reserve Form G–4 with the Federal Reserve Bank of the district in which the principal office of the lender is located."

Thus, by the plain language of Regulation G, it is to apply *only* to those lenders who can register with a Federal Reserve Bank of the district in which the lender has a principal place of business. And so the Board has said in a press release of March 10, 1968:

" * * * [the] margin requirements of the regulation apply only to credit extended or arranged for by lenders who are subject to the registration requirement of § 207.1(a)"

Of course, no such districts exist for West Germany or England, so a foreign lender cannot register as required.

The Securities Exchange Act of 1934 expressly exempts from its coverage those who transact in securities outside the jurisdiction of the United States. Section 30(b) of the Act (15 U.S.C. § 78dd(b)) provides:

"The provisions of this chapter or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter."

This provision has been expressly construed to exclude foreign banks. Schoenbaum v. Firstbrook, 405 F.2d 200, 208 (2d Cir. 1968).

Plaintiff has submitted no persuasive authority as to the applicability of Regulation G to foreign lending institutions. However, such judicial and other authority that exists supports the proposition that Regulation G does not apply. See Kook v. Crang, 182 F.Supp. 388 (S.D.N.Y.1960) (inapplicability of Regulation T to Canadian broker-dealer); Schoenbaum v. Firstbrook, *supra*; Weiner, Regulations U, T and G and the Application Thereto Foreign Entities and Transactions, 86 Banking L.J. 507, 509 (June 1969).

The inapplicability of Regulation T seems equally clear and no showing has been made whatsoever that the lending institutions involved herein are members of a national securities exchange or are brokers or dealers within the application of that regulation. 12 C.F.R. 220. Certainly, the plaintiff herein has not submitted authority sufficient to invoke the drastic remedy which it seeks herein. Furthermore, insofar as its discovery motion directed to defendant Kleiner-Bell is concerned, while such defendant may be subject to Regulation T there is no evidence that said defendant performed any acts herein which would subject it to regulation herein. Rather, that defendant has

filed an affidavit stating that it has not arranged, directly or indirectly, any of the financing or given any counsel or advice with respect thereto. Accordingly, absent a further showing, the motion for discovery as to such defendant is denied.

Plaintiff MGM further contends that the tender offer as announced on August 6, 1969 violates Section 14(d) of the Securities Exchange Act, 15 U.S.C. § 78n(d). Section 14(d) (6) of the Securities Exchange Act requires that:

"Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor * * * *."

The applicability of the section depends, of course, upon whether the tender offer referred to constitutes an offer within the contemplation of the statute. If so, it violates Section 14(d) (6) because it fails by its terms to remain open for the required ten-day period.

However, the Court is not convinced that this is in effect a new offer nor that assuming it were such fact would justify the drastic remedy of a temporary injunction. While a finding of failure to comply with Section 14(d) might invoke a judicial direction to extend the period of the tender offer, no sufficient showing to support the invocation of any such direction has been made herein. Plaintiff does not seek to extend the period of the offer but to enjoin it.

Since as I have found there has been no showing of violations of Regulations G or T, there is no merit to plaintiff's claim that Tracy's failure to disclose such violations makes its tender offers "misleading", under Section 14(e) of the Securities Exchange Act, Title 15 U.S.C. § 78n(e).

No useful purpose would be served in the limited time available in detailing the irreparable damage which might well fall upon the shareholders who have already tendered their shares or upon Tracy were the tender offer enjoined. No showing has been made that even if the loan agreements were violative of Regulation G or T they would be unenforceable by Tracy or that the foreign lending institutions could assert illegality of the loans as a defense to an action for specific performance.

On all of the facts presented herein and on the law, the motion for a preliminary injunction and the discovery motion hereinbefore referred to are in all respects denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R. Civ.P.

So ordered.