**UNITED STATES of America**

v.

**WEISSCREDIT BANCA COMMERCIALE E D'INVESTIMENTI, Rolando Zoppi and Andre Backar, Defendants.**

**No. 70 Cr. 29.**

United States District Court,
S. D. New York.

April 15, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D. New York, for the United States; Gary P. Naftalis, Asst. U. S. Atty., of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant Weisscredit Banca Commerciale E D'Investimenti; John P. Ohl, Paul W. Williams, Michael F. Armstrong, Joseph P. Foley, Warren H. Colodner, New York City, of counsel,

WYATT, District Judge.

This is a motion by defendant Weisscredit Banca Commerciale E D'Investimenti (Weiss) to dismiss the indictment on the ground that it fails to allege an offense by movant. Fed.R.Crim.P. 12(b) There is an alternative ground that the government has failed to give movant "fair warning that it is subject to the laws it is charged with violating". The motion must be denied in all respects.

The indictment was returned on January 14, 1970 and has five counts. The movant is named in the first four counts, along with two other defendants, Rolando Zoppi and Andre Backar.

On January 23, 1970, defendant Backar was arraigned for pleading on the indictment before Judge McLean and pleaded not guilty. Bail was fixed at a $20,000 unsecured personal recognizance bond, and such a bond was filed with the Clerk on January 26, 1970.

On March 13, 1970, Weiss appeared by counsel and pleaded not guilty to the indictment before Judge Ryan. The government's application for a bench warrant for the arrest of Rolando Zoppi was denied at that time by Judge Ryan with a direction that the warrant would issue on June 9, 1970, the return date then set for any motions to be made by Weiss, if Zoppi did not submit himself to the jurisdiction of the Court by that date.

On June 9, 1970, the government renewed its application for a bench warrant for Rolando Zoppi, and at the direction of this Court the bench warrant issued. It has not been executed, evidently because Mr. Zoppi has remained outside the territorial jurisdiction of the United States.

The statute principally here involved is Section 7(c) of the Securities Exchange Act of 1934 (15 U.S.C. § 78g(c); the "1934 Act").

Before considering the indictment in any detail, the background and purpose of this statute should be noted, together with the relevant Board regulations.

### 1. The 1934 Act; Margin Requirements; Regulation T

The 1934 Act provided for control of stock exchanges. It was made unlawful to use the mails or any other means of interstate commerce to effect any transaction in a security through a stock exchange unless that exchange was registered as a "national securities exchange". Such registration was with the Securities and Exchange Commission (SEC). It was also made unlawful to effect any transaction in any security on a national securities exchange unless a registration was effective "as to such security for such exchange" (15 U.S.C. § 78l (a)); securities as to which such a registration is effective are sometimes called "registered securities".

As part of the 1934 Act, Congress provided for regulations by the Board of Governors of the Federal Reserve System ("the Board") of the amount of credit which might be extended or maintained on registered securities; by amendment effective July 29, 1968, the provision was broadened so that the credit regulations would apply to "any security", registered or not (15 U.S.C. § 78g). These regulations are often called "margin requirements".

Having in mind the 1929 collapse of the stock market and the depression years which followed, Congress was anxious to use credit control to prevent undue fluctuations in the securities market. At the same time, Congress hoped to protect the investor, especially the small investor, by making it impossible to buy securities on too small, or "thin", a margin.

The 1934 Act (Section 7(a); 15 U.S.C. § 78g(a)) directed the Board to prescribe rules and regulations covering the amount of credit which can be extended and maintained on securities.

The 1934 Act (Section 7(c); 15 U.S.C. § 78g(c)) made it unlawful "for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer —* * * on any security * * * registered on a national securities exchange, in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe * * *".

By amendment effective July 29, 1968, this prohibition of the Act was made applicable to "any broker or dealer", whether or not transacting business "through the medium" of a member of a national securities exchange. The amendment, as earlier noted, also extended control to credit on "any security", whether or not registered on a national securities exchange.

The 1934 Act defines "broker" and "dealer" (15 U.S.C. § 78c(a) (4) and (5)). A "broker" is one "engaged in the business of effecting transactions in securities for the account of others". A "dealer" is one "engaged in the business of buying and selling securities for his own account". The terms "broker" and "dealer" do not include a "bank" but "bank" is defined to mean only *domestic* institutions (15 U.S.C. § 78c (a) (6)).

Congress thus gave power to the Board to determine what margin must be required for securities purchases. The amount of margin required by regulations of the Board has varied from time to time. After November 6, 1963, the required margin was 70% of current market value; after June 8, 1968, the required margin was 80% of such value; since May 6, 1970, the required margin has been 65% of such value. The period covered by the indictment is from September 1, 1966 to return of the indictment on January 14, 1970.

Under the 1934 Act, the Board has issued three separate sets of regulations dealing with extension and maintenance of credit on securities. Each set is applicable to a different category of persons or institutions. At the period relevant to this indictment, the titles of the three sets of regulations were as follows:

(1) Regulation G— "Credit by Persons Other than Banks, Brokers, or Dealers For Purpose of Purchasing or Carrying Registered Equity Securities" (12 CFR § 207.1 and following);

(2) Regulation T— "Credit by Brokers, Dealers, and Members of National Securities Exchanges" (12 CFR § 220.1 and following); and

(3) Regulation U— "Credit by Banks for the Purpose of Purchasing or Carrying Registered Stocks" (12 CFR § 221.1 and following).

The principal effect of these regulations is to fix the margin requirements for buying and carrying securities; the amount of the margin fixed has been already stated for the period since November 6, 1963.

Regulation T is cited in this indictment, specifically four sections published as 12 CFR §§ 220.3(b), 220.4(b), 220.7 (a), and 220.8.

The scheme of Regulation T is, in summary, that (subject to specific exceptions) all financial relations between a broker or dealer and his customer be included in a "general account"; that

no transaction be effected for a customer which causes the debit balance in the "general account" to be more than the "maximum loan value" of the securities in that account; and that the Board determine from time to time the "maximum loan value" of securities.

Section 220.3(b) contains the prohibition against effecting any transaction which causes the debit balance in the "general account" to exceed the "maximum loan value".

Section 220.4(b) authorizes a member of a national securities exchange to have a "special omnibus account" for a special type of customer. Prior to July 8, 1969, the special type of customer was defined in the section as follows:

" * * * a broker or dealer from whom the member accepts in good faith a signed statement to the effect that he is subject to the provisions of this part (or that he does not extend or maintain credit to or for customers except in accordance therewith as if he were subject thereto) * * *"

and from whom two written notices were received. The significance of the "special omnibus account" seems to be that, because of the special type of customer involved, the ordinary margin requirements are inapplicable. Before July 8, 1969, the special type of customer had to be a "broker" or "dealer" who himself enforced the margin requirements in respect of his own customers; this being so, there was no occasion to enforce the margin requirements as between such broker or dealer and the member of a national securities exchange with whom he had a special omnibus account. The broker or dealer enforced the margin requirements either because he was subject to them (because he transacted "a business in securities through the medium of" a member of a national securities exchange, see 12 CFR § 220.1) or because he gave the signed statement described within parentheses in the quotation above from Section 220.4(b). Since July 8, 1969, the special type of customer has been defined in the section (as amended) as follows:

" * * * another member of a national securities exchange or a broker or dealer registered with the Securities and Exchange Commission * * *"

and from whom the same two written notices are received. The amendment restricted the special omnibus account to those brokers or dealers who were registered with the SEC (15 U.S.C. § 78o) while an amendment at the same time to Section 220.1 made Regulation T applicable to "every broker or dealer" (whether or not transacting "a business in securities through the medium of" a member of a national securities exchange). A part of the Board's press release at the time is instructive (CCH Fed.Sec.L.Rep. pp. 83,640–41):

"After the effective date of the amendments, credit not subject to margin requirements will be available through a special omnibus account only to members of national stock exchanges and brokers and dealers registered with the SEC. Under the present Regulation T, this type of credit can be extended to persons, including foreign firms, who merely certify that they observe the regulation even though they are not subject to it.

"By use of a special omnibus account, a member of an exchange may make wholesale transactions for other brokers without regard to margin requirements. These transactions involve securities on which margin requirements have already been imposed at the retail level.

"Under the amendments, the privilege of using the special omnibus account will no longer be available to organizations, including foreign financial institutions and others, that prefer to remain unregistered. Most firms borrowing in special omnibus accounts will not be affected by the amendments. In the case of accounts of unregistered persons, no further substitutions of collateral will be permitted after 90 days from the effective date of the amendments. Credit extended in such accounts will have to

be brought up to margin requirements within a year.

"Last December, the Department of Justice and the SEC presented to the House Banking and Currency Committee evidence of abuses whereby special omnibus accounts had been used by some foreign financial institutions to avoid U. S. margin requirements."

Section 220.7(a) permits those subject to Regulation T to "arrange for" credit for a customer upon the same terms and conditions imposed by the Regulation.

Section 220.8 is the provision fixing the "maximum loan value" of securities for margin purposes. This value was 30% of the market value until June 8, 1968, was 20% until May 6, 1970, and since May 6, 1970 has been 35%. This means that the customer had to put up as "margin" 70% of the market value until June 8, 1968, 80% until May 6, 1970, and after that 65%.

The statute and regulations, on study, are seen to be simple in design. They carry out, of course, a highly important public policy.

### 2. The Substantive Counts—
### 2, 3, and 4

The parties appear to have discussed the first four counts together, the conspiracy count (1) and the substantive counts (2, 3, and 4). It may be somewhat clearer to consider the substantive counts first, and then the conspiracy count.

The substantive counts aver that Weiss was a broker and dealer engaged in the transaction of business in securities through the medium of Shearson, Hammill & Co., Inc. (Shearson), a member of a national securities exchange; that defendant Backar was a registered representative of Shearson; that Weiss, Zoppi, and Backar unlawfully extended and maintained credit to customers of Weiss and Shearson in contravention of Regulation T, specifically the four sections earlier discussed; and that Weiss, Zoppi, and Backar unlaw-fully arranged for the extension and maintenance of credit to such customers. In count 2, the customer is Victor Posner; in count 3, the customer is Herbert Rounick; in count 4, the customer is Frank Stranahan.

The period covered by these counts is from April 17, 1967 to March 5, 1969.

The indictment cites as to these counts 15 U.S.C. §§ 78g(c) and 78ff(a), Regulation T, and 18 U.S.C. § 2.

As noted before, Section 78g(c) of Title 15 makes it unlawful for any "broker or dealer who transacts a business in securities through the medium of" a member of a national securities exchange to extend, or maintain, or to arrange for the extension or maintenance of, credit to a customer in contravention of regulations of the Board. Section 78ff(a) of Title 15 is the penalty section.

■ The indictment in these counts charges the essential elements of the offense in the words of the statute. Counts in such form are plainly sufficient against such a motion as this. There can no longer be any reliance on technicalities in criminal pleading. The situation here is the same as it was in United States v. Debrow, 346 U.S. 374, 377–378, 74 S.Ct. 113, 115, 98 L.Ed. 92 (1953) where the Court said:

"The charges of the indictments followed substantially the wording of the statute, which embodies all the elements of the crime, and such charges clearly informed the defendants of that with which they were accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense."

### 2(a)

It is argued for Weiss that it cannot be subject to Regulation T because it is a "bank" rather than a "broker" or a "dealer", whether before July 8, 1969, "engaged in the transaction of a business in securities through the medium of" a member of a national securities

exchange or after July 8, 1969, otherwise a "broker" or "dealer".

█ The facts as to the operations of Weiss do not appear on this motion and strictly speaking are not relevant. The indictment properly charges that Weiss is subject to Regulation T. In the papers and at oral argument, it was agreed that Weiss is in fact a Swiss banking institution and this will be assumed for purposes of the present motion, as if it appeared in the indictment.

A Swiss banking institution can still be a "broker" or "dealer". The question is one of fact, whether Weiss was within the statutory definitions (15 U.S.C. § 78c(a) (4) and (5)). These definitions exclude "a bank" but this term is in the same section (15 U.S.C. § 78c(a) (6)) defined as a *domestic* institution only.

## 2(b)

It is argued for Weiss that Regulation T was not intended to apply to foreign banks and that the Board has never approved application of Regulation T to foreign banks.

█ There is nothing in Regulation T which indicates any exemption for foreign banks.

It is said, however, that Regulation T was effective in October 1934 whereas Regulation U was effective much later in May 1936. Thus, if foreign banks were subject to Regulation T, there would have been an application of the margin requirements to foreign banks in advance of a similar application to domestic banks.

Regulation T is not applicable to foreign banks as such but only if they meet the definition of "broker" or "dealer" therein.

If, indeed, Regulation T were applicable to foreign banks as such before any similar regulation was applicable to domestic banks, this would not seem strange. It would be open to the Board to conclude that domestic banks are subject to normal regulation and examina-

tion better known to the Board than that to which foreign banks are subject.

It is further said that the Board has never treated foreign banks as brokers or dealers. This may well have been because no foreign bank has been shown to be a "broker" or "dealer". The Board has never stated that Regulation T is inapplicable to foreign brokers or dealers. The only instance cited for Weiss when the question may be said to have been presented to the Board, in connection with the extension of credit by a foreign broker to a domestic one, resulted in a determination that a "foreign broker [who] maintains no place of business in the United States, but 'transacts a business in securities through the medium of a member of a national securities exchange' * * * appears to fall within the definition of the term 'creditor' "; it was found, however, that, for the purpose of deciding the question presented, it was "unnecessary * * * to determine whether, or to what extent, the foreign broker would be required to comply with Regulation T * * *" 25 Federal Reserve Bulletin 721, 722 (1939). Such a pronouncement scarcely supports a conclusion that a foreign bank cannot be a "broker" or "dealer" for Regulation T coverage.

## 2(c)

█ It is argued for Weiss that Regulation T has never been construed to cover foreign banks. Language is cited from a SEC report, namely, Report of Special Study of the Securities Markets (Part 4, at page 5 (1963)):

"The Board has exercised only a part of the powers granted to it under the Exchange Act. While the act gives the Board authority to regulate the extension of credit by brokers and all persons other than brokers, the Board has promulgated only Regulation T (relating to brokers) and Regulation U (relating to domestic banks). There are persons engaged in the business of lending for the purpose of purchasing or carry securities, no-

tably so-called factors and foreign banks, which are not subject to either regulation * * *"

This means only that a foreign bank *as such* is not subject to Regulation T. But these counts do not so charge Weiss. They charge, in appropriate language, that Weiss at the relevant times was "a broker and dealer engaged in the transaction of business in securities within the United States through the medium of a national securities exchange". This distinguishes the case at bar from such decisions cited for Weiss as Bronner v. Goldman, 361 F.2d 759, 762 (1st Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 295, 17 L.Ed.2d 214 (1966) and Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F.Supp. 1354 (S.D.N.Y.1969). In the decision last cited, Judge Tenney recognized the point involved when he said (303 F.Supp. at 1358):

> "The inapplicability of Regulation T seems equally clear and no showing has been made whatsoever that the lending institutions involved herein are members of a national securities exchange or are brokers or dealers within the application of that regulation. 12 C.F.R. 220."

### 2(d)

At this point, it may be well to consider an argument for Weiss based on legislative activity in Congress which led to the enactment, effective October 23 or 26, 1970, of an amendment to the 1934 Act which is 15 U.S.C. § 78g(f).

The SEC and perhaps others became concerned with the use of funds borrowed from foreign lenders for the purpose of taking over control of companies registered on a national securities exchange. An example of such use was seen in the *Metro-Goldwyn-Mayer* case (cited above) where Judge Tenney held that neither Regulation T nor Regulation G was applicable to "foreign lending institutions".

Section 78g(f) was an attempt to deal with the problem and it did it by regulating the borrower rather than the

lender. The section forbids the use of credit, no matter where obtained, by a citizen or resident of the United States or one involved with such a person for the purchase of securities in the United States or of United States securities if the transaction by which he obtained such credit would have been prohibited if it had occurred within the United States.

■ It is unnecessary to consider at any length the arguments which are made for Weiss in connection with the legislative history of Section 78g(f). Much of this argument is premised on the theory, already discussed at length and rejected, that as a matter of law the function of Weiss as charged in the indictment was not that of a "broker" or "dealer". Whether Weiss acted as a "broker" or "dealer" subject to Regulation T is an issue of fact for trial.

The point about the legislative history of Section 78g(f) is that Weiss is not charged with acting as one of "the foreign lending institutions" to which Judge Tenney referred in his *Metro-Goldwyn-Mayer* decision. Section 78g (f) has in no way changed the applicability of Regulation T.

### 2(e)

It is argued for Weiss that it is exempt from Regulation T because of the provisions of 15 U.S.C. § 78dd(b). The cited section, part of the 1934 Act, excludes from the application of the 1934 Act (and thus from Regulation T)

> "* * * any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this title."

The SEC has not prescribed any rules or regulations under the cited section.

The 1934 Act does not apply to transactions outside the United States which are part of "a business in securities without the jurisdiction of the United

States". The 1934 Act does apply "to those foreign transactions not specifically exempted". Schoenbaum v. Firstbrook, 405 F.2d 200, 208, reversed en banc on other grounds, 405 F.2d 215 (2d Cir. 1968), cert. denied as Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

■ The difficulty with the argument as to these counts is that they charge that Weiss was "engaged in the transaction of business in securities *within* the United States". (emphasis supplied) This seems to have been included specifically to avoid any such argument as now made. Whether the government can prove the averment that Weiss did engage in the transaction of a business in securities within the United States is another matter, not relevant to the present motion.

In this connection, it is interesting to note the following statement from Roth v. Fund of Funds, Ltd., 405 F.2d 421, 422 (2d Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969):

"* * * Section 30(b) is inapplicable because when the Fund bought and sold the securities in question on the New York Stock Exchange, utilizing New York City stock brokers to execute its orders to buy and sell, and made payment for the purchases through a New York bank, it was not transacting a 'business in securities without the jurisdiction of the United States.'"

### 2(f)

An argument for Weiss is based on the wording of Section 220.4(b) before July 8, 1969. At that time a special omnibus account could be used for a broker or dealer who made "a signed statement * * * that he does not extend or maintain credit to or for customers except in accordance with [Regulation T] as if he were subject thereto". It is said for Weiss that this shows that there were persons like Weiss "who may qualify to open an omnibus account as brokers or dealers, even though they are not subject to Regulation T" (Memo of Law, page 37). It is also pointed out that in the press release which accompanied the Board's announcement of the 1969 amendments, it was said that before the amendment "this type of credit can be extended to persons, including foreign firms, who merely certify that they observe the regulation even though they are not subject to it". CCH Fed. Sec.L.Rep. ¶ 77,717 at pp. 83,639-640.

■ It is perfectly true that before July 8, 1969, brokers or dealers who did *not* transact "a business in securities through the medium of" a member of a national securities exchange were *not* subject to Regulation T. Such was the then provision of Section 220.1.

This is of no help to Weiss, however, because these counts charge that Weiss was "engaged in the transaction of business in securities within the United States through the medium of a member of a national securities exchange".

It has already been pointed out that after July 8, 1969 the coverage of Regulation T was expanded and the availability of special omnibus accounts was narrowed.

### 2(g)

It is argued for Weiss that even if it were fully subject to Regulation T as a "broker" or "dealer" it could not violate the four sections of the Regulation cited in these counts.

■ As to Sections 220.3(b) and 220.8, the situation is as follows. Section 220.3(b) forbids the extension of credit in various types of accounts in excess of the maximum loan value of the securities in the account as set out in Section 220.8. More specifically, Section 220.3(b) provides that those subject thereto may not "effect" transactions for a customer which would result in an extension of credit to the customer beyond that permitted by Section 220.8. It is said for Weiss that to "effect" a securities transaction is to "execute" the transaction on an exchange. Such a reading is much too narrow. Such a reading would limit the scope of the sec-

tion, in the case of registered securities, to members of national exchanges, even though they were merely carrying out the orders of a broker or dealer acting on a customer's instructions and extending credit to such a customer. Such a limitation would be wholly unwarranted and would defeat the purpose of the Regulation in contexts far more commonplace than that before the Court. The legislative history shows that the term "effect" as used in Section 9 of the 1934 Act (15 U.S.C. § 78i) and other sections means "to * * * [participate] in a transaction whether as principal, agent, or both". S.Rep. No. 972, 73d Cong. 2d Sess. 17 (1934). That "effect" has the same meaning when used in Regulation T seems clear, particularly in view of the adoption in Regulation T of many definitions from the Act. 12 CFR § 220.2(a). As to Section 220.4, it is said that since the section forbids nothing, Weiss could not possibly violate it. While on its face the section permits the establishment of a special omnibus account, rather than forbidding any conduct, the section must be read together with Section 220.3(b)(1) which forbids the extension of credit in a general account beyond the maximum loan value set forth in Section 220.8(a). Section 220.3(a) requires all transactions between a creditor and a customer to be in or to be deemed in a general account except as permitted in Section 220.4 (of which subsection (b) authorizes the establishment of a special omnibus account on the terms and conditions set forth in the subsection). Any special omnibus account not established and maintained as provided in Section 220.4(b) would not be a "special account provided for by § 220.4" and would therefore be a general account for purposes of the credit limitations imposed under Sections 220.3(b)(1) and 220.8(a), which forbid a creditor to "effect * * * any transaction" which would result in an extension of credit beyond the maximum loan value of the securities in the general account. Of course, a special omnibus account can be maintained under Section 220.4(b) only by a member of a national securities exchange and Weiss is not averred to be such a member. Shearson is such a member, however, and, as will later appear, Weiss can be convicted under these counts if Weiss in fact aided and abetted Shearson in any violation effected by the failure of a purported special omnibus account to comply with any provision of Regulation T.

As to Section 220.7(a), it is said for Weiss that the charge in the indictment is that Weiss extended the unlawful credit. Therefore, it is said that Weiss could not violate Section 220.7(a) which deals with "Arranging for loans by others". The difficulty is that these three substantive counts do charge that Weiss did "arrange for the extension and maintenance of credit to and for customers". There is, thus, no basis for the argument made. Moreover, even if Shearson arranged for credit at Weiss and Weiss (after such arrangement) merely loaned money, Weiss, as will later appear, could be convicted under these counts as an aider and abettor in a violation of the Section by Shearson.

2(h)

■■■■ If, however, it be assumed on the basis of any argument for Weiss (or all of them) that Weiss was not subject to Regulation T and thus could not violate it as a principal, there is still no warrant for dismissing these counts. Weiss could be found to have aided and abetted Shearson in a violation of Regulation T; indeed, these counts cite the aiding and abetting section (18 U.S.C. § 2).

Shearson is averred to be a member of a national securities exchange and thus was beyond question subject to Regulation T (12 CFR § 220.1 both before and after July 8, 1969). The facts at trial may show a violation by Shearson of Regulation T and an aiding and abetting thereof by Weiss. For example, it may be shown that Shearson arranged with Weiss to extend credit to one or more of the three customers named in these counts. If this credit exceeded

that which Shearson itself could extend, then Shearson was in violation of 12 CFR § 220.7(a) and Weiss might be found guilty as an aider and abettor.

A defendant may be convicted under a substantive count as an aider and abettor although not so named in the indictment. United States v. Tropiano, 418 F.2d 1069, 1083 (2d Cir. 1969), cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). Shearson as a possible principal is identified in these counts but even such identification in the indictment is not necessary; it is stated in the opinion just cited: "it is unnecessary that the principal be first convicted or even identified". A good illustration of this is Meredith v. United States, 238 F.2d 535, 541–542 (4th Cir. 1956).

3. The Conspiracy Count—Count 1

This first count charges Weiss, Zoppi, Backar and others not named with a violation of the normal conspiracy statute (18 U.S.C. § 371). What now follows is a summary of the averments of count 1.

Weiss was a broker and dealer engaged in the transaction of business in securities within the United States through the medium of Shearson, a member of a national securities exchange; Zoppi was general manager of Weiss; Backar was an officer of Shearson.

Between September 1, 1966 and January 14, 1970 (when the indictment was returned), defendants and others not named conspired to violate 15 U.S.C. §§ 78g(c) and 78ff(a) and Regulation T, specifically Sections 220.3(b), 220.4(b), 220.7(a), and 220.8 thereof. The object was to extend credit to customers of Shearson in contravention of Regulation T, the margin requirements.

The agreed means were for Weiss to open a special omnibus account with Shearson; defendants would then arrange for customers of Shearson to open accounts at Weiss; defendants would then arrange for Weiss to extend credit to the Shearson customers far in excess of that permitted by Regulation T, some-

times up to 80% of the market value of securities [as opposed to the 20% or 30% permitted at the time by Regulation T]; Backar would cause Shearson to execute orders from customers but would do so in the name of Weiss in order to conceal the unlawful extension of credit; Backar and other Shearson employees would then inform Weiss of the orders and the names of the customers so that Weiss could maintain a record of the unlawful extensions of credit; and in this way defendants caused more than three million dollars in unlawful credit to be extended.

A number of overt acts are set forth.

Nearly all of the arguments for Weiss as to count 1 have already been considered in connection with counts 2–4. There are two which may be specifically aimed at count 1 only.

### 3(a)

It is argued for Weiss that arranging for the extension of credit in violation of 12 CFR § 220.7(a) requires the "cooperative action" of two parties, the person who arranges (said to be Shearson) and the person who extends the credit (said to be Weiss). Application is then urged of the rule that "where it is impossible under any circumstances to commit the substantive offense without co-operative action, the preliminary agreement between the same parties to commit the offense is not an indictable offense either at common law * * * or under the federal statute". Gebardi v. United States, 287 U.S. 112, 122, 53 S.Ct. 35, 37, 77 L.Ed. 206 (1932).

Even if accepted, this argument would not lead to dismissal of count 1; it is addressed only to a part of the count.

The argument cannot be accepted, however, because the conspiracy charged includes more persons than those whose cooperation is necessary to the offense.

"When those whose cooperation is necessary for the commission of the substantive crime conspire with another person to commit the offense, all are guilty of conspiracy". 1 Wharton's

Criminal Law and Procedure (1957 ed.) 193.

The conspiracy charged includes the three defendants "and divers other persons to the Grand Jury known and unknown". Who these "other persons" are cannot be known from the face of the indictment. One possibility is the three customers named in the substantive counts. It is idle to speculate. If there is no proof at trial that there were any "other persons" the trial judge can deal with the matter at that time.

### 3(b)

It is argued for Weiss that the first count cannot be sustained because none of the conspirators named in the indictment had the capacity to violate Section 7 of the 1934 Act or Regulation T, being neither brokers, dealers or members of a national securities exchange. The count charges, however, that Weiss was "a broker and dealer", etc. and the government may be able to prove this at trial.

Assuming, however, that none of the defendants had the capacity to violate Section 7 or Regulation T, this does not render the count defective. A person may be convicted of conspiracy to commit an offense which he lacks the capacity to commit himself. See, e. g., Wilson v. United States, 230 F.2d 521, 527 (4th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 789, 100 L.Ed. 1460 (1956). It is not necessary for the person having the capacity to commit the offense which is the object of the conspiracy charged to be named in the indictment. See United States v. Guest, 383 U.S. 745, 756–757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). It may not be necessary that the person having the capacity to commit the offense be a co-conspirator at all. Joyce v. United States, 153 F.2d 364, 367 (8th Cir.), cert. denied, 328 U.S. 860, 66 S.Ct. 1349, 90 L.Ed. 1631 (1946); Bartkus v. United States, 21 F.2d 425, 426 (7th Cir. 1927). Finally, it is not necessary for the indictment to charge that the defendants conspired to "cause" the violation of law charged to be the object

of the conspiracy by the person having capacity to commit the substantive offense; it is sufficient to charge a conspiracy to violate the law. United States v. Lester, 363 F.2d 68, 72–73 (6th Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967).

It may be shown at trial that one or more of the "divers other persons" named as co-conspirators had the capacity to commit the offense, for example, Shearson. This would be sufficient to meet the present argument, regardless of the capacity of the named defendants.

### 4. "Fair Warning"

Movant Weiss urges that if it be subject to Regulation T, then all counts in the indictment in which it is named as a defendant must be dismissed because the government did not give "fair warning" that Regulation T extended to "foreign banks" and that "the conduct challenged in the indictment was considered unlawful". Apparently the expression "fair warning" is a paraphrase of "fair notice" which appears in a Supreme Court opinion reversing a conviction for "failure of a statute limiting freedom of expression to give fair notice of what acts will be punished * * * ", Winters v. New York, 333 U.S. 507, 509, 68 S.Ct. 665, 92 L.Ed. 840 (1948), a decision not remotely like the case at bar.

In support of its "fair warning" argument, Weiss cites such cases as United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967); James v. United States, 366 U.S. 213, 81 S.Ct 1052, 6 L.Ed.2d 246 (1961); and Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). Such cases rest on the principle stated in *Laub* (385 U.S. at 487, 87 S.Ct. at 581):

> "Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach."

No "assurance" of this character is shown for Weiss.

There is nothing in the 1934 Act nor in Regulation T which in any way suggests that a "foreign bank" cannot be a "broker" or "dealer" if its activities fit the definition of those terms. Ezra Weiss, counsel to the New York Regional Office of the Securities and Exchange Commission, states in his treatise, published in 1965, that foreign banks are not excluded from the definitions of brokers and dealers in Section 3 of the 1934 Act (15 U.S.C. § 78c) and are consequently subject to the 1934 Act "for all purposes". E. Weiss, Registration and Regulation of Brokers and Dealers 3, n. 3 (1965).

The "fair warning" principle may be perfectly valid for application to some fact situations. There are no facts which would justify its application here.

The motion is in all respects denied.

So ordered.