[L.A. No. 30767. Dec. 8, 1977.]

UFITEC, S.A., Plaintiff and Appellant, v.
WILLIAM H. CARTER, Defendant and Respondent.

240

COUNSEL

Lawler, Felix & Hall, Kenneth B. Wright, Robert P. Mallory and Charles G. Ehrlich for Plaintiff and Appellant.

Dern, Mason, Swerdlow & Floum, Nicholas & Nebenzahl, Frederick M. Nicholas, Richard H. Floum and Melvyn Mason for Defendant and Respondent.

OPINION

**CLARK, J.**—Plaintiff UFITEC, S.A. (UFITEC), a Swiss banking corporation, appeals from judgment in favor of defendant William H. Carter in an action to recover under Carter's agreement to absorb losses incurred in a security trading venture. We affirm the judgment.

Carter, a Los Angeles resident, was president of Kleiner Bell Realty Company, subsidiary of Kleiner Bell Company, Inc., a security brokerage firm, which as part of its business underwrote speculative new issues.

In Los Angeles 1968, UFITEC and Carter negotiated an oral agreement providing as the trial court found: "(a) UFITEC would advance 100% of the funds necessary for the purchase for the joint venture of securities recommended by Carter up to a projected maximum of $250,000; (b) Each of the proposed purchases by Carter for the joint venture was subject to UFITEC's absolute right of veto; (c) A discretionary trading account would be opened in UFITEC's name at Kleiner, Bell & Co. to facilitate such purchases and sales. Carter would be granted a power of attorney to place orders with Kleiner, Bell & Co. on UFITEC's behalf; (d) All securities purchased by Carter for this joint venture were to be taken in either UFITEC's name or in street name and were to be held by or for UFITEC, UFITEC to have the absolute right at any time, at its sole and absolute discretion to cause said securities to be sold; (e) UFITEC was to open a special house account to be known as the 'BCU Account' (said initials standing for Bill Carter-UFITEC), in which all purchases and sales made by Carter for the joint venture would be recorded and accounted for; (f) UFITEC was to charge to this BCU account interest at a variable rate on all moneys it advanced for the purchase of securities credited to said account, as well as its standard commissions on all securities purchased for and sold from said account;

(g) *The trading profits,* if any, remaining in said BCU account, after UFITEC's interest charges and commissions and other normal costs of trades had been paid, were then *to be distributed ⅔ to Carter and ⅓ To UFITEC; (h) All losses to the BCU account were to be borne solely by Carter*; (i) Quarterly statements on the status of the BCU account were to be rendered by UFITEC to Carter."[1] (Italics added.)

Carter purchased securities for UFITEC from October 1968 to July 1969. UFITEC paid $341,288.75 for securities recommended by Carter. The net result of the various transactions was a loss totalling—as of 30 June 1974—$381,979.70. Included within the transactions were a $90,000 purchase of Canadian securities through a Canadian broker and an additional $86,000 purchase of Canadian securities from a Nevada resident.

During the period the BCU account was active, UFITEC's primary business was banking. It purchased securities of approximately $10 million of which 20 percent were for its own account and the balance for clients. Its American security business approximated 3 or 4 percent of UFITEC's lending business and a smaller percentage of UFITEC's total arranged financing.

The trial court concluded that UFITEC, in respect to the BCU transactions, acted as a broker and/or dealer within the meaning of section 7 of the Securities Exchange Act of 1934 (15 U.S.C. § 78g) and regulation T of the Board of Governors of the Federal Reserve System (12 C.F.R. § 220.1 et seq.). It was found that UFITEC extended credit to a customer in violation of section 7 and regulation T, barring recovery of any loss. The court also concluded, "alternatively," that UFITEC could not recover damages because it was obligated to timely liquidate the BCU securities under regulation T and, had it done so, no loss would have been suffered.

Section 29(b) of the act provides in part: "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . .".

---

[1]At trial Carter claimed he did not agree to bear the losses, but concedes the evidence supports the court's contrary finding.

Section 7 of the act provided in part at the time of the agreement: "(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall . . . prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security . . . (c) It shall be unlawful for . . . any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer . . . (1) On any security . . . in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section."

A broker is defined as: "[A]ny person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." A dealer is defined as: "[A]ny person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business." (15 U.S.C. § 78c (a)(4), (5).) A bank is defined to include only domestic institutions. (15 U.S.C. § 78c (a)(6).)

Regulation T of the Board of Governors of the Federal Reserve System permits but limits broker and dealer extension of credit to a customer in a margin transaction involving registered securities. (12 C.F.R. § 220.1 et seq.) If the regulation is applicable, it was undisputedly violated.

### EXTENSION OF CREDIT

UFITEC contends credit was not extended within the meaning of section 7 because Carter had no ownership interest in the BCU account and because UFITEC was the sole owner of the securities in the account.

However, looking at either the transaction's form or substance, it clearly involved an extension of credit. Regulation T includes within the definition of "customer" any "joint venture" in which a creditor participates, when the venture would be considered a customer of the creditor if the creditor were not a participant. The transaction in form comprised a joint venture between Carter and UFITEC to purchase and sell securities, UFITEC advancing money to the joint venture and receiving interest on its advancements. In the instant case, division of

profits and losses differed from the contribution of funds. The board has ruled that such joint ventures constitute an extension of credit. (31 Fed.Reg. 7169 (1966); 34 Fed.Reg. 9121 (1969).)

In substance, as secured lender, UFITEC clearly. extended credit to Carter as reflected by UFITEC's retaining title to the shares, by its right to liquidate the account, and by its asserted right to recover money—with interest—advanced on Carter's covenant to absorb all losses. If the margin requirement of regulation T could be avoided by the simple expedient of placing the securities in the lender's name, and by giving it veto power over transactions with a right to liquidate, the regulation would be of little effect. UFITEC's position does not differ substantively from that of a pledgee who takes possession of pledged property, who limits his duty to make future advances, and who has the right to sell in satisfaction of the debt. (See 39 Cal.Jur.2d, pp. 496-497, 538-540.)

UFITEC also relies upon Carter's testimony that the securities in the BCU account belonged to UFITEC at all times. (Carter took the position at trial that he did not agree to bear losses and that his share of the profits was for making investment opportunities available to UFITEC. The trial court rejected Carter's testimony.) However, placing the securities in UFITEC's name weighs little against the credit theory in view of the interest and loss provisions. In any event the trial court could properly reject Carter's testimony, finding a debtor-creditor relationship.

## BROKER OR DEALER

UFITEC urges it was not a broker or dealer because, its security transactions being a relatively small part of its investment banking and placement activity, it was not "engaged in the business" for either itself or others within the act's meaning. However, its security business constituted several million dollars, UFITEC charging a commission for its service.

The phrase "engaged in the business" connotes a certain regularity of participation in purchasing and selling securities, but there is no requirement such activity be a person's principal business or principal source of income. (2 Loss, Securities Regulation (1961) p. 1295; Loomis, *The Securities Act of 1934 and the Investment Advisers Act of 1940* (1959) 28 Geo.Wash.L.Rev. 214, 246; cf. *Securities & Exch. Comm.* v. *United Financial Group, Inc.* (9th Cir. 1973) 474 F.2d 354, 356-357.) The purpose of the margin requirement could be effectively defeated if large

businesses in this country were permitted to use a small percentage of their total activity to lend in excess of the margin requirement.

## FOREIGN FINANCIAL INSTITUTIONS

UFITEC next contends foreign financial institutions are not subject to the margin requirement. There is no provision in the act, or in regulation T, expressly exempting foreign financial institutions. Although section 30(b) of the act exempts security business carried on outside the United States, it is an exemption for foreign activity—not for foreign institutions carrying on regulated domestic activity.

Section 30(b) of the act provides: "The provisions of this chapter or of any rule or regulation thereunder shall not apply to any person *insofar as* he transacts a *business* in securities *without* the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this Title." (Italics added; 15 U.S.C. § 78dd(b).)

The exemption then is determined by the activity's location rather than by the actor's nationality. The exemption is not a blanket one for foreign brokers and dealers but only for a person "insofar as he transacts a business in securities" outside United States jurisdictional limits.

The federal courts have considered the exemption in a number of contexts and it is difficult to fully reconcile some of the decisions. However, the instant situation is a relatively clear one. The improper conduct occurred within the United States. This is contrasted to improper conduct occurring elsewhere but with related activity occurring in the United States. Thus, in *Roth* v. *Fund of Funds, Ltd.* (2d Cir. 1968) 405 F.2d 421, 422, a Canadian corporation with offices in Switzerland was not exempt from the insider trading restrictions when it made profits on the purchase and sale of securities on the New York Stock Exchange. Similarly, in *United States* v. *Weisscredit Banca Com. E D'Invest.* (S.D.N.Y. 1971) 325 F.Supp. 1384, 1392-1393, involving regulation T, the Swiss bank's motion to dismiss indictment on the ground of exemption was denied when the indictment alleged that the Swiss bank was "engaged in the transaction of business in securities within the United States."

Other cases have gone even further, holding the act applicable to foreign firms when some of their acts occurred in the United States but much of the regulated conduct occurred outside the country. (*Securities & Exch. Comm.* v. *United Financial Group, Inc., supra,* 474 F.2d 354, 357-358; *Leasco Data Processing Equipment Corp.* v. *Maxwell* (2d Cir. 1972) 468 F.2d 1326, 1333-1337; *Schoenbaum* v. *Firstbrook* (2d Cir. 1968) 405 F.2d 200, 207-209.)

Even the principal case relied upon by UFITEC reflects that in determining whether the section 30 exemption applies, we look not to the nationality of the lender but to the activity in the United States. In *Kook* v. *Crang* (S.D.N.Y. 1960) 182 F.Supp. 388, 390-391, an American citizen purchased Canadian securities on margin through a Toronto broker. He personally delivered his first purchase check to Toronto and the checks for the second purchase and five margin calls were mailed from the United States. The Canadian broker was registered with the Securities Exchange Commission, maintaining a branch office in New York, but the office did not deal with individual investors. The transaction complied with the Toronto Stock Exchange margin requirement but not with regulation T. While holding that regulation T was not applicable, the court indicated the investor could have recovered if he could "show some act done within the United States either in furtherance of the direct or indirect extension of credit or in furtherance of the direct or indirect maintenance of credit." (182 F.Supp. at p. 391.)

The genesis of this venture lies in Los Angeles, California. UFITEC entered the lending transaction here and the security account was maintained here. Section 7 of the act and regulation T regulate the extension of credit, the very acts UFITEC engaged in within the United States.

Application of regulation T to the instant transaction is consistent with the policies established by the act and regulation T. The objectives of Congress by imposing control on margin transactions include protecting unsophisticated investors against improvident speculation on credit, and preventing excessive credit causing untoward fluctuations on the market. (See 15 U.S.C. § 78b.) Obviously, the unsophisticated investor suffers the same loss whether his lender is a national or a foreigner. The untoward fluctuations of the market due to lender financing include prices of stock being forced up excessively by speculative purchases financed by loans. When the stock commences to drop, some speculators are then unable to

meet margin calls with the result that lenders will sell the stock without consideration of the investment's merit. This results in forcing the price of the stock down, possibly inducing panic selling as occurred in 1929. However, when the borrower must furnish 80 percent—rather than 20 percent—of the price of the stock from his own funds, the risk of excessive appreciation and margin calls is greatly reduced. Obviously, the risks of excessive *appreciation* due to margin loans, and of excessive *depreciation* due to margin calls, is the same whether the funds are loaned by a national or by a foreign lender.

UFITEC also relies upon statements by members of Congress and governmental press releases to the effect that prior to 1969 foreign firms were not subject to margin requirements. The statements were made in connection with legislative and administrative proposals to make the margin requirements, which theretofore restricted only lenders, restrict borrowers, so that the transaction could be regulated even though the lender was not subject to United States jurisdiction. The statements are not helpful to UFITEC. Section 7 of the act applied only to brokers and dealers engaged in the security business (15 U.S.C. § 78c(a)(4), (5)), thus foreign firms who were not brokers or dealers were not covered. In addition, foreign transactions were exempt under section 30. Thus, Americans could secure credit abroad without meeting the margin requirements. The statements did not specify that all foreigners were exempt from the margin requirements and should not be understood as so providing.

Pointing out that regulation U, dealing with bank loans, and regulation G, governing margin lenders other than banks, brokers, and dealers, were interpreted as not applying to foreign institutions (*Metro-Goldwyn-Mayer, Inc.* v. *Transamerica Corporation* (S.D.N.Y. 1969) 303 F.Supp. 1354, 1358), UFITEC urges regulation T should likewise be interpreted not to apply to foreign institutions. However, interpretation of regulations U and G excluding foreign institutions was based on the language used in those regulations (*id.*) and no comparable language appears in regulation T.

No substantial reason has been offered why foreign brokers and dealers engaged in business in the United States should be permitted to engage in transactions prohibited to American brokers and dealers.

## CANADIAN SECURITIES

█ UFITEC next urges that the transactions in Canadian securities were exempt from section 7 and regulation T.[2] About half of the Canadian securities were purchased on the Canadian Exchange, the other half privately from a Nevada resident.

█ As pointed out above, the credit arrangement occurred in Los Angeles, and when the conduct to be regulated—here, extension of credit—occurs within the United States, the act is applicable. In addition it should be noted that purchase of the Canadian securities was for the BCU account, that even as to the securities purchased on the Canadian Exchange there were communications relating to the transaction from Los Angeles, and that the Canadian security transactions were only a part of the overall transactions primarily conducted in the United States.

## GOOD FAITH

█ Section 29(c) of the act provides: "Nothing in this Chapter shall be construed (1) to affect the validity of any loan or extension of credit . . . unless at the time of the making [thereof] . . . the person making such loan or extension of credit . . . *shall have actual knowledge of facts by reason of which the making of such loan or extension of credit* . . . is a violation of the provisions of this chapter or any rule or regulation thereunder, . . ." (Italics added; 15 U.S.C. § 78cc(c).)

On its face, this language exculpates a person only for his violation of the act based upon lack of *factual* knowledge, not ignorance of applicable law. UFITEC was aware of all of the facts giving rise to the violation of section 7 and regulation T, and may not avail itself of the section 29(c) defense.

## COMMON COUNTS

█ Characterizing its violations of section 7 and regulation T as "technical," UFITEC next urges that the illegality of the loan should not

---

[2]Carter urges that this contention and the next two were raised for the first time on appeal and thus should not be considered. Although a party may ordinarily not change his theory on appeal, the rule does not apply when the facts are not disputed and the party merely raises a new question of law. (*Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 725-726 [344 P.2d 307].) The facts relative to the Canadian security transactions are undisputed.

bar the common counts upon which its complaint was framed. ■ However, it is well settled that ordinarily a culpable party to an unlawful agreement may not recover in quasi-contract the value of his performance or the consideration paid. (See *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 [308 P.2d 713]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) p. 301.) ■ UFITEC's violation of section 7 and regulation T may not be characterized as "technical." It loaned 100 percent of the cost of the stock when the law permitted a 20 percent maximum.

## Pari Delicto

■ UFITEC claims that it should not be barred from recovery of its loans by the *pari delicto* doctrine because it assertedly acted in good faith while Carter's conduct was assertedly reprehensible. However, at the times relative here, the federally imposed margin requirements forbade brokers from extending undue credit but did not forbid customers from accepting such credit. "This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker, for the original need for margin requirements undoubtedly derived from the common desire of investors to speculate unwisely on credit." (*Pearlstein* v. *Scudder & German* (2d Cir. 1970) 429 F.2d 1136, 1141.) Since Carter's conduct in obtaining the extension of credit violated neither the statute nor regulation—while UFITEC's extension of credit did—there is no basis for an exception to the *pari delicto* doctrine.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.