Filed 1/14/16  Charlot v. Carefusion Resources CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID CHARLOT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CAREFUSION RESOURCES, LLC,<br><br>    Defendant and Respondent. | D066320<br><br><br><br>(Super. Ct. No. 37-2012-00084769-CU-WT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

Law Office of Johanna S. Schiavoni, Johanna S. Schiavoni; Wingert Grebing Brubaker & Juskie and Alan Brubaker for Plaintiff and Appellant.

Wilson Turner Kosmo, Lois M. Kosch and Katherine M. McCray for Defendant and Respondent.

David Charlot was an at-will employee of CareFusion Resources, LLC (CareFusion).  After one of Charlot's subordinates made a complaint against him, CareFusion hired outside counsel to conduct an investigation.  Based on the results of the

investigation, CareFusion terminated Charlot's employment "for cause," but only after Charlot rejected an offer to voluntarily resign and receive a severance package.

Charlot brought suit against CareFusion alleging a variety of claims arising out of his termination. CareFusion filed a motion for summary judgment, and while that motion was pending, Charlot moved for leave to file an amended complaint. The court denied Charlot's motion and later granted CareFusion's motion for summary judgment. Charlot appeals the ensuing judgment.

Charlot contends the superior court erred in denying his motion for leave to file an amended complaint and in granting CareFusion's motion for summary judgment. He also challenges many of the trial court's evidentiary rulings in connection with the motion for summary judgment. We find no merit in Charlot's arguments. Thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

CareFusion is a San Diego based international healthcare and medical technology company. Charlot is a graduate of Columbia Business School who worked as a treasury director at Tyco International in New Jersey. Charlot's supervisor at Tyco was Amarendra Duvvur who joined CareFusion as its treasurer in June 2009.

On June 17, 2009, CareFusion offered Charlot the position of assistant treasurer, to assist in building CareFusion's treasury department when the company was preparing to spin off from its parent company, Cardinal Health, Inc. Duvvur actively recruited Charlot to join CareFusion. Charlot eventually accepted the position and signed an offer letter that indicated the position was "at will." He began working for CareFusion in July 2009.

2

In his role as assistant treasurer, Charlot directly supervised a team of managers and analysts. On or about January 16, 2012, Nishanthe Ratnayake, one of Charlot's direct reports and a manager in the treasury department, filed an internal complaint against him. The complaint alleged Charlot retaliated against Ratnayake and bullied him because Ratnayake previously raised concerns regarding a disclosure in a CareFusion 10Q filing and other issues relating to financial reporting. Ratnayake also claimed Charlot created a hostile work environment in the treasury department.

CareFusion hired Richard Freeman, an attorney at Sheppard Mullin Richter & Hampton, to investigate the complaint. CareFusion's director of human resources assisted in the investigation. Freeman spent about six weeks investigating Ratnayake's complaint and interviewed approximately 15 employees. Freeman interviewed both Charlot and Ratnayake multiple times. During the course of the investigation, hundreds of documents, including emails, were reviewed. Freeman also engaged subject matter experts in treasury function from PriceWaterhouseCoopers (PWC) to advise him on aspects of treasury work at issue in the investigation.

On March 19, 2012, Freeman submitted a written report memorializing his findings (Freeman Report), accompanied by numerous exhibits, a detailed chronology, and analysis of a warning letter Charlot had issued to Ratnayake.

Freeman found substantial evidence to support Ratnayake's allegations. Specifically, he found evidence supporting the claim that Charlot retaliated against Ratnayake on multiple occasions for raising financial concerns both internally and to the Securities and Exchange Commission (SEC). For example, Freeman found "[a]dverse

3

employment actions were taken against [Ratnayake] soon after" he raised financial concerns, and such actions were, in part, motivated by Ratnayake's complaints. One such adverse employment action was a January 2011 disciplinary letter prepared by Charlot and Duvvur, without going through established human resource channels, which contained "subjective and insulting" characterizations of Ratnayake, but was supported by "little if no written or factual substantiation." Furthermore, witnesses reported to Freeman that they overheard Charlot discussing how to get rid of Ratnayake because Ratnayake raised questions. Also, witnesses reported they had been threatened if they raised questions about financial mistakes.

Freeman also found that evidence showed Charlot created a hostile working environment within the treasury department. In particular, Freeman reported "[u]nprofessional, demeaning, and inappropriate communications" from Charlot to Ratnayake, Charlot's "open manifestation" of personal dislike for Ratnayake, and a culture of "not raising mistakes for fear of reprisal as well as favoritism." In the report, Freeman concluded Charlot was a "rogue" manager who displayed "serious character and empathy flaws."[1]

At the conclusion of the investigation, Freeman orally reported his findings in a meeting with CareFusion's in-house attorneys, including employment law specialist Anne Minteer and general counsel Joan Stafslien, as well as chief financial officer Jim Hinrichs, who oversaw the treasury department. Freeman subsequently presented his

_____

[1] The record indicates that Charlot vehemently disagrees with Freeman's findings and claims that the conclusion of the investigation was predetermined.

4

findings and provided copies of his report and supporting exhibits at a second meeting, which was attended by CareFusion's chief executive officer, in-house attorneys, and Hinrichs.

Based on Freeman's findings, CareFusion made the decision to terminate Charlot's employment. Hinrichs met with Charlot. During the meeting, he read from "talking points" created to explain to Charlot the reasons for the termination. The talking points stated that Ratnayake's complaints against Charlot had been substantiated. Further, evidence indicated that Charlot "showed a pattern of behavior that demonstrated extremely poor judgment, created an unhealthy environment within [the treasury department] and violated [CareFusion's] policies and Code of Conduct." During this meeting, Hinrichs also offered Charlot the opportunity to voluntarily resign for "personal reasons" and receive a standard severance package in exchange for signing a release of all claims against CareFusion. Charlot did not accept the severance package.

Reading from other "talking points," Duvvur apparently informed members of the treasury department that Chariot was "leaving CareFusion" but provided no specific details.[2] Later CareFusion's vice-president of internal audit, Steve Morrison, who was

---

2    The parties both agree that Duvvur made the presentation to the treasury department. However, neither party has pointed to any portion of the record detailing exactly what was said at the presentation. Instead, both parties apparently agree that Duvvur relayed the information contained in the talking points. These talking points were contained in an attachment to an e-mail sent from Donna Vincent, CareFusion's vice-president of human resources to Hinrichs, Minteer, and three other individuals at CareFusion. Neither party explains who authored the talking points. In essence, the only admissible evidence of what was said during Duvvur's presentation to the treasury department regarding Charlot leaving CareFusion is the talking points themselves.

5

responsible for corporate compliance, asked Hinrichs why Chariot's employment was terminated. Hinrichs informed him there was "no compliance matter . . . involved" and Charlot "ha[d] been terminated and that's all you need to know." Hinrichs could not remember exactly what else he said to Morrison, but testified during deposition that he may have said something to the effect of, "[Chariot] acted in a way he shouldn't have acted and he's been let go."

After his termination, Charlot filed a complaint against CareFusion, alleging causes of action for breach of implied contract, breach of the implied covenant of good faith and fair dealing, violation of Labor Code section 970, defamation, promissory estoppel, and negligent infliction of emotional distress. In the complaint, Charlot averred that he was an outstanding employee, but was fired for pretextual reasons after a bad faith investigation in which reasons to support a "for cause" termination were manufactured.

CareFusion subsequently moved for summary judgment. While that motion was pending, Charlot sought leave to file a first amended complaint. In the proposed first amended complaint, Charlot wanted to remove the causes of action in his original complaint for breach of implied contract, violation of Labor Code section 970, and negligent infliction of emotional distress. He desired to add causes of action for wrongful termination, fraud, negligent misrepresentation, and intentional infliction of emotional distress.

CareFusion opposed Charlot's motion, contending it would be prejudiced if the court permitted Charlot to file an amended complaint and none of the new claims stated facts sufficient to constitute causes of action.

6

After hearing oral argument and considering the pleadings and evidence filed, the superior court denied Charlot's motion. In doing so, the court explained that none of the new proposed claims stated a valid cause of action.

Charlot then filed an opposition to CareFusion's motion for summary judgment, to which CareFusion filed a reply. Each party also objected to evidence offered by the other party.

After hearing oral argument as well as considering the pleadings and evidence submitted, the court granted the motion for summary judgment. In doing so, the court found that the evidence was undisputed that Charlot was an at-will employee. In fact, the court was satisfied that Charlot took the job with CareFusion under the explicit understanding that he was an at-will employee. As such, Charlot's claims for breach of implied contract, breach of the covenant of good faith and fair dealing, violation of Labor Code section 970, and promissory estoppel all failed. In regard to Charlot's defamation claim, the court sustained CareFusion's objection to the admission of one allegedly defamatory statement on hearsay grounds and found the other allegedly defamatory statement was privileged under Civil Code section 47, subdivision (c). The court also found no evidence that any of the statements were made with malice. Finally, the court determined Charlot's cause of action for negligent infliction of emotional distress was without merit because Charlot did not offer any authority that CareFusion breached a duty owed to Charlot, and even if there was a breach, workers' compensation exclusivity would bar Charlot's claim. Included in its order granting CareFusion's motion for

7

summary judgment, the court also specifically ruled on the various evidentiary objections.

Charlot timely appealed the ensuing judgment.

DISCUSSION

I

*MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT*

" 'Leave to amend a complaint is . . . entrusted to the sound discretion of the trial court. ". . . The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse. More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court. Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not supported by the record." ' " (*Branick v. Downey Savings and Loan Assn.* (2006) 39 Cal.4th 235, 242; italics omitted.)

Charlot maintains the superior court committed reversible error in denying his motion for leave to file a first amended complaint. He contends the motion was brought during the "early stages of the case" and the court did not make any findings regarding prejudice to CareFusion or undue delay by Charlot. Charlot further asserts that the superior court's discretion to deny his motion is constrained by strong judicial policies favoring resolution of the merits. He additionally insists that the court must exercise "great liberality" in allowing amendments to a complaint. Although we agree with the general legal principles Charlot argues (see, e.g., *Board of Trustees of Leland Stanford Jr. University v. Superior Court* (2007) 149 Cal.App.4th 1154, 1163, 1173), here, the

8

superior court denied Charlot's motion for leave to file a first amended complaint because none of the claims stated a valid cause of action. Such a basis is sufficient grounds on which to deny leave to amend a complaint. (*California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274, 280-281 (*California Casualty*).)

Although Charlot attempts to distinguish *California Casualty*, *supra*, 173 Cal.App.3d 274, we find no fault with the superior court's approach here. If the proposed causes of action were not valid, it makes little sense to allow the amended complaint to be filed only to be dismissed in the face of a demurrer or motion to strike. Further, we note that at the hearing where the court denied Charlot's motion, Charlot's counsel specifically asked if the denial was without prejudice to refile another amended complaint to address the shortcomings the court found. The court responded that Charlot could "do whatever you're allowed to under the law." Thus, although the court denied Charlot's motion, the order left open the possibility of Charlot attempting to amend his complaint at a later time. There is no indication in the record that he did so.

We review the trial court's denial of a motion to amend a complaint for abuse of discretion. (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486.) Here, the court denied Charlot's motion for leave to file an amended complaint on the grounds that none of the claims were valid. Accordingly, we will independently review whether each of the proposed claims states a valid cause of action as a matter of law. If we determine that any of the allegations state a valid cause of action, we will conclude that the court abused its discretion here.

9

A.  Wrongful Termination in Violation of Public Policy

Charlot contends he stated a valid claim for wrongful termination in violation of public policy in his proposed first amended complaint.  We disagree.

The tort of wrongful termination in violation of public policy is an exception to the rule that an at-will employee may be terminated for no reason or for a reason that is arbitrary or irrational.  (*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1104; see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176 (*Tameny*).)  Typically, the tort arises in circumstances where the employer retaliates against an employee who (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a statutory right or privilege; or (4) reported an alleged violation of a statute of public importance.  (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090-1091 (*Gantt*).

Because the concept of a "public policy" defies precise definition and courts are loath to venture into this arena to avoid judicial policymaking, the policies encompassed by the exception have been limited to those which are "carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions . . . ."  (*Gantt*, *supra*, 1 Cal.4th at p. 1095.)  "A requirement that a policy be 'delineated' [in a statute or constitutional provision] entails more specificity than merely being 'derived from' or 'based' on its source.  To 'delineate' means '. . . to describe in detail, esp. with sharpness or vividness' [citation]; ' . . . to describe, portray, or set forth with accuracy or in detail' [citation]."  (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480.)  Because employers are deemed to have knowledge of the fundamental public policies expressed in state and federal Constitutions and statutes, the constraint of delineation in a

10

given provision ensures that employers are on notice of the policies which, if contravened in discharging an employee, will subject them to tort liability. (*Silo v. CHW Medical Foundation*, *supra*, 27 Cal.4th at p. 1104.) And, although the employer's precise wrongful act, such as firing an employee for refusing to commit a crime, need not be specifically prohibited for the public policy exception to apply, the provision in question must sufficiently describe the kind of conduct that is prohibited to enable an employer to know the fundamental public policies that are expressed in that particular law. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256, fn. 9; *Sequoia*, *supra*, at p. 1480.)

In the proposed first amended complaint, Charlot alleged he was terminated "in violation of public policy against employers lying to their employees, defaming their employees and misrepresenting [Charlot's] conduct and character." The complaint further averred "[CareFusion was] not truthful with [Charlot] and created a false, arbitrary and capricious and against public policy reason for this termination."

Even with a liberal reading of Charlot's proposed complaint, it is plain that his allegations fail to reference any statutory or constitutional right that was violated. Citing *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66 (*Green*), Charlot argues that his failure to identify a public policy in his complaint is not fatal to his claim because he is permitted to identify the policy for the first time in opposing summary judgment. We do not share Charlot's expansive reading of *Green*. In that case, the defendant objected to the sufficiency of the complaint's allegation of a public policy for the first time in connection with the Supreme Court's review of the Court of Appeal's reversal of the superior court's grant of the summary judgment motion. Indeed, our high court observed:

11

"Defendant did not argue in the Court of Appeal that plaintiff should have specified the statutory basis for his claim in his complaint, and the court did not address that issue." (*Id*. at p. 84.) Thus, the court in *Green* did not address whether a plaintiff can state a valid claim in a complaint for wrongful termination in violation of public policy without specifically citing to a statute or regulation. *Green* therefore is not helpful to Charlot's argument. (See *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [" 'It is axiomatic that cases are not authority for propositions not considered.' "].)

Charlot also claims that the superior court "improperly stymied" his efforts to pursue his wrongful termination action by denying his motion for leave to amend. Not so. Charlot does not cite to anywhere in the record where he argued about additional allegations he could allege or other facts that would establish a valid claim for wrongful termination in violation of public policy. Indeed, Charlot's counsel asked the court whether its ruling was without prejudice presumably so he could file an amended complaint to address the issues raised by the court. The court did not foreclose that opportunity. However, for reasons that Charlot has not explained, he failed to address any of the problems with his proposed amended complaint and did not attempt to later move to amend with new allegations.

Nevertheless, now on appeal, Charlot attempts to explain how he could have alleged a valid claim for wrongful termination in violation of public policy. Although we observe that Charlot may have forfeited such an argument by failing to raise it in superior court (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564), we exercise our discretion to address Charlot's

12

argument on the merits because it presents a question of law (see, e.g., *UFITEC, S.A. v. Carter* (1977) 20 Cal.3d 238, 249, fn. 2).

Charlot maintains that he could allege two theories of public policy violations to make his wrongful termination against public policy claim valid. First, he contends that Ratnayake had a well documented history of filing false complaints and CareFusion was concerned that he was going to file another complaint giving rise to liability so it "concocted a scheme to terminate Charlot in an effort to deflect that potential liability." Charlot claims that CareFusion was concerned about liability under title 18 United States Code section 1514A, title 18 United States Code section 1513(e), and title 15 United States Code section 78u-6(h)(1)(A). In other words, Charlot insists CareFusion terminated him to help it avoid liability under these statutes. These are not the statutes Charlot is looking for.

Each one of these statutes protects a whistleblower. Title 18 United States Code section 1514A provides certain whistleblower protections for employees of publicly traded companies. Title 18 United States Code section 1513(e) prohibits retaliation against a person for providing information to law enforcement regarding the commission of a federal offense. Title 15 United States Code section 78u-6(h)(1)(A) also provides protection to whistleblowers by prohibiting employers from retaliating against an employee who provides certain information regarding alleged violations of securities laws. Here, Charlot does not explain how CareFusion's termination of his employment violates any of these statutes. He does not allege that he is a whistleblower. Charlot does not clarify how his termination deflected CareFusion's potential liability under any of

13

these statutes. Accordingly, these new allegations do not give rise to a valid claim for wrongful termination in violation of public policy.

Charlot's second theory that he was terminated in violation of public policy fares no better than his first. He contends that there exists a "fundamental and well-established public policy against a person filing bad faith complaints under the guise of whistleblowing." In support of this policy, Charlot relies on 17 Code of Federal Regulations section 240.21F-2(b)(1) and 17 Code of Federal Regulations section 240.21F-8(c)(7). The first regulation sets forth under what circumstances a whistleblower is protected from retaliation, including "possess[ing] a reasonable belief that the information" being provided "relates to a possible securities law violation." (17 C.F.R. § 21F-2(b)(1)(i).) The second regulation denies eligibility for an award to a would be whistleblower who "knowingly and willfully make[s] any false, fictitious, or fraudulent statement or representation, or use any false writing or document knowing that it contains any false, fictitious, or fraudulent statement . . . ." (17 C.F.R. § 21F-8(c)(7).) Charlot thus reads these two portions of regulations as establishing a public policy to discourage bad faith complaints. He then asserts that he was managing and documenting Ratnayake's conduct, which included Ratnayake making false reports. Charlot concludes he was therefore resisting Ratnayake's conduct that violated public policy.

We find at least two faults with Charlot's argument. First, far from establishing a "fundamental and well-established public policy against a person filing bad faith complaints under the guise of whistleblowing," the regulations on which Charlot rely simply help define a specific instance in which a whistleblower will be protected from

14

retaliation and explain a circumstance under which a potential whistleblower will not be eligible for an award. And these regulations, like the statutes on which Charlot also relies, create part of the framework to protect whistleblowers. They do not establish a public policy against making bad faith complaints. Instead, they simply remove any whistleblower protections or benefits from one who makes a bad faith report. Second, the regulations at issue do not prohibit any conduct by employers. They do not forbid an employer from terminating an employee who is disciplining another employee who allegedly made a bad faith complaint as a potential whistleblower.

Indeed, the lack of merit to Charlot's public policy claim is demonstrated when compared to cases where a public policy violation was found. These cases involve such matters as forcing the employee to participate in illegal activity or discharging the employee for reporting illegal conduct that directly affects the public. (*Green*, *supra*, 19 Cal.4th at p. 71 [employee discharged for complaining to management that defendant was shipping airline parts that failed inspections in violation of the Federal Aviation Act]; *Gantt*, *supra*, 1 Cal.4th at p. 1097 [employee discharged for refusing to give false testimony]; *Tameny*, *supra*, 27 Cal.3d at p. 169 [employer forced an employee to participate in an illegal price fixing scheme]; *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1149 [employee fired for reporting violations of overtime laws to management]; *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1122-1123 [employee discharged after reporting to management that company executives were violating bribery, embezzlement, and tax laws]; *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 298 [employee was discharged for protesting unsafe work conditions];

15

*Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188-189 [employer insisted an employee perjure himself].) The allegations here are not analogous to any of these cases. At best, Charlot claims he was fired for trying to manage another employee who was making bad faith complaints. No such public policy is violated in terminating Charlot even if we assume Charlot was engaging in the activity he claims he was. The court therefore did not abuse its discretion in finding Charlot had not stated a valid claim for wrongful termination in violation of public policy.

## B. Fraud

Charlot also contends that he stated a valid cause of action for fraud. We are not persuaded.

To state a fraud claim, Charlot must allege "(a) misrepresentation; (b) defendant's knowledge of the statement's falsity; (c) intent to defraud (i.e., to induce action in reliance on the misrepresentation); (d) justifiable reliance; and (e) resulting damage." (*Hunter v. Up-Right, Inc.* (1993) 6 Ca1.4th 1174, 1184 (*Hunter*).) In his proposed first amended complaint, Charlot alleged CareFusion made two misrepresentations: (1) Charlot would enjoy a long-term career with CareFusion, and (2) Charlot was terminated for violating CareFusion's Code of Conduct. We agree with the superior court that Charlot has failed to state a valid cause of action for fraud.

In denying Charlot's motion for leave to amend, the superior court found that Charlot could not reasonably rely on any promise of a long-term employment because he concedes he was an at-will employee. On appeal, Charlot does not explain how the court erred in making this finding or otherwise challenge this determination. Instead, he

16

merely assumes "without conceding" that the trial court was correct. As such, we deem he has waived this issue on appeal by his failure to cite to any legal authority or otherwise argue that the superior court was wrong. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["Appellate briefs must provide argument and legal authority for the positions taken. 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].)

Charlot's other allegation of fraud involved CareFusion misrepresenting why he was fired. In the proposed first amended complaint, Charlot alleges that CareFusion provided him with a false reason to explain why it terminated his employment. This is not actionable as fraud. (See *Hunter, supra,* 6 Cal.4th at p. 1184.)

In *Hunter*, an employer made a misrepresentation to induce an employee to resign. (*Hunter*, *supra*, 6 Cal.4th at p. 1179.) The Supreme Court held that the employee could not recover tort damages based on this allegedly fraudulent act because the employer could have directly terminated the plaintiff's employment and had merely introduced the element of misrepresentation in the course of affecting that result. (*Id*. at pp. 1178, 1184.) Thus, the plaintiff did not rely to his detriment on the misrepresentations in suffering constructive dismissal. (*Id*. at p. 1184.) Here, there is no difference in the allegations of fraud in connection with Charlot's termination and the alleged fraud in *Hunter*.

Nevertheless, on appeal, Charlot now argues that the superior court "misconstrued" his second theory of fraud. He insists that his second theory of fraud

(although not alleged anywhere in the proposed first amended complaint) is that CareFusion created a fraudulent scheme to manufacture cause to terminate him and placate a troublesome employee.  In support of his position, Charlot relies on *Lazar v. Superior* Court (1996) 12 Cal.4th 631 (*Lazar*).)  Such reliance is misplaced.

In *Lazar*, *supra*, 12 Cal.4th 631, the Supreme Court clarified its holding in *Hunter*, *supra*, 6 Cal.App.4th 1174, and explained that *Hunter* "did not mean thereby to suggest that simply effecting a termination in conjunction with fraudulent conduct will insulate an employer from an otherwise properly pled fraud claim.  We meant, rather, to preclude fraud recovery only where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination." (*Lazar*, *supra*, at p. 643.)

The employee in *Lazar*, *supra*, 12 Cal.4th 631 brought an action against his former employer for various causes of action, including fraud and deceit and promissory estoppel, after being terminated from his management position.  (*Id*. at p. 637.)  The plaintiff employee had been working in New York from 1972 to 1990 with a family-owned restaurant equipment company.  (*Id*. at p. 635.)  The defendant employer asked him to leave his job to come work for the defendant in Los Angeles and, when the employee expressed concern about relocating, the defendant employer falsely told him his job in Los Angeles would be secure and would involve significant pay increases.  (*Id*. at pp. 635-636.)  The company's representations to the plaintiff regarding the terms on which he would be retained, the defendant's financial health, and the potential compensation to the plaintiff were false and, when making them, the defendant's agents

18

knew they were false. (*Id*. at p. 636.) Two years after relocating to Los Angeles, the defendant terminated the plaintiff's employment and told him that his job was being eliminated owing to management reorganization. (*Id*. at pp. 636-637.)

In concluding that the plaintiff employee could state claims against his employer, the Supreme Court explained that there can be a valid fraud claim even in the context of wrongful termination if the " 'misrepresentation [was] not aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect . . . ." (*Lazar*, *supra*, 12 Cal.4th at p. 640; italics omitted.) The court stressed the two factors that must be present are detrimental reliance and the employer's misrepresentation must be different from an ordinary constructive wrongful termination claim. (*Id*. at p. 643.) The Supreme Court held that the employee did have a claim for fraud because the defendant's misrepresentations "were made before the employment relationship was formed, when [defendant] had no coercive power over [the plaintiff] and [the plaintiff] was free to decline the offered position." (*Id*. at p. 642.) Further, the misrepresentations resulted in damages to the plaintiff that included expenses incurred in relocation and the loss of security and income associated with his former employment and these damages were distinguishable from those incurred as a result of the termination itself. (*Id*. at pp. 642-643.)

*Lazar, supra,* 12 Cal.4th 631 establishes that employees can maintain a cause of action for fraud against their employer only if they allege all of the elements of such a claim, including detrimental reliance, and if they allege damages distinct from the termination itself. Here, Charlot's fraud claim differs substantially from the plaintiff's

19

claim in *Lazar*. Charlot has not alleged any misrepresentation beyond CareFusion's stated reason for terminating his employment. Although he references a fraudulent scheme that presumably consists of CareFusion's investigation of the complaints against Charlot, he does not and cannot aver any misrepresentations made to him as part of the investigation except for the reasons for the termination itself.

In addition, Charlot has not alleged any damages distinguishable from those incurred as a result of the termination itself. (See *Lazar*, *supra*, 12 Cal.4th at p. 643.) In the proposed first amended complaint, he states he has been damaged in an amount to be established according to proof, but not less than $400,000. This is the same amount that he claims for his cause of action for wrongful termination in violation of public policy. In the operative complaint, he also alleges that CareFusion terminated him to avoid paying him "in excess of $400,000 in earned bonuses and vesting of his equity stocks." These allegations make clear that Charlot's fraud damages are the same as the damages he seeks for his termination.

Charlot also contends that he detrimentally relied on the misrepresentation that he was fired for violating the Code of Conduct. Again, putting aside that he did not allege these facts in the proposed first amended complaint and only offered them in the first instance in his opening brief here, we are puzzled by this claim. Charlot clearly does not believe cause existed justifying his termination. Both the operative complaint and the proposed first amended complaint include several allegations that he was a great employee, who received accolades, raises, bonuses, and "above target" performance evaluations. There is no indication that in the proposed first amended complaint that he

20

believed CareFusion when he was informed he was terminated for violating the Code of Conduct. Yet, somehow this misrepresentation induced him "to detrimentally alter his position in his evaluation of whether to accept a voluntary termination and severance package." Charlot, however, does not explain how the misrepresentation altered his evaluation. Was he more likely to take the severance package if CareFusion offered no reason for the termination? Indeed, he does not allege that "but for" the misrepresentation, he would have accepted the severance package. Simply put, Charlot's allegations of detrimental reliance are not persuasive and contradicted by the other allegations in the complaint.

Finally, Charlot claims that he has sufficiently alleged fraud based on the allegation that CareFusion has forced him to participate in a fraudulent scheme because he must inform prospective employers that he was terminated for cause. Charlot, however, offers no explanation or authority to support the proposition that a plaintiff repeating a defendant's alleged misrepresentation to a third party has alleged a cause of action for fraud. Without any explanation or authority, we deem this argument waived. (See *Nelson v. Avondale Homeowners Assn., supra,* 172 Cal.App.4th at p. 862.)

## C. Negligent Misrepresentation

Charlot contends that he stated a valid claim for negligent misrepresentation. We do not agree.

The elements of negligent misrepresentation are "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance

21

on the misrepresentation, and (5) resulting damage." (*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.) In contrast to fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements " ' "honestly believing that they are true, but without reasonable ground for such belief, . . . may be liable for negligent misrepresentation. . . ." ' " (*Ibid*.)

Here, Charlot argues that for the same reasons that support his fraud claim, he has alleged a valid claim for negligent misrepresentation. Because the only difference between the elements of a fraud claim and a negligent misrepresentation claim is scienter, we reject Charlot's contentions on the same grounds as his fraud claim. Charlot offers no additional arguments for our consideration.

### D. Intentional Infliction of Emotional Distress

Charlot also insists that he stated a valid claim for intentional infliction of emotional distress (IIED). We disagree.

The elements of an IIED claim are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 209 (*Davidson*).) Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. (*Ibid*.) "Generally, conduct will be found to be actionable where the 'recitation of the facts to an average member of

22

the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " (*KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028.)

The fact that conduct might be termed outrageous is not itself sufficient. "The tort calls for intentional, or at least reckless conduct—conduct intended to inflict injury or engaged in with the realization that injury will result." (*Davidson*, *supra*, 32 Cal.3d at p. 210.) The conduct must be of a nature that is especially calculated to cause mental distress of a very serious kind. (*Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 165, fn. 5 (*Ochoa*).)

Moreover, to support the cause of action, "[i]t is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 (*Christensen*).) "The requirement that the defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes intentional infliction of emotional distress from the negligent infliction of such injury." (*Id*. at p. 904.) In circumstances in which a plaintiff seeks to recover for emotional distress suffered as the result of conduct directed primarily at another, recovery—to the extent it has been allowed at all—"has been limited to ' "the most extreme cases of violent attack, where there is some especial likelihood of fright or shock." ' " (*Id*. at p. 905, *quoting* Ochoa, *supra*, 39 Cal.3d at p. 165, fn. 5.)

In the proposed first amended complaint, Charlot alleged that CareFusion "engaged in intentional and deliberate acts and omissions [it] knew would cause, and caused, [Charlot] to suffer severe emotional distress." There is no description of these

23

acts or omissions in the proposed complaint. In his opening brief, Charlot attempts to clarify these allegations by concluding that the "decision to terminate him was conducted, implemented and communicated to him in an outrageous manner." Again, Charlot does not provide any details that indicate CareFusion's conduct was so extreme as to exceed all bounds of that usually tolerated in a civilized community. (See *Davidson*, *supra*, 32 Cal.3d at p. 209.) As best we can glean from the allegations in the proposed amended complaint, CareFusion told Charlot he was being terminated for cause because he violated the Code of Conduct. We do not deem this allegation to explain conduct that would cause an average member of the community to exclaim, " 'Outrageous!' " (See *KOVR–TV, Inc. v. Superior Court, supra*, 31 Cal.App.4th at p. 1028.) These allegations certainly do not rise to the level of outrageous conduct in the cases cited by Charlot.

For example, in *Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241, an employee was told by her superior, in disregard of IBM's policies, that she would have to choose between her employment and her romantic relationship with a competitor's employee. Although she was told that she had a couple of days to make her decision, her superior called her in the next day and told her that he had made up her mind for her and that she would end the relationship. When the employee refused she was fired. The court stated that the superior's conduct was sufficiently outrageous to constitute intentional infliction of emotional distress because the "combination of statements and conduct would under any reasoned view tend to humiliate and degrade [the employee]." (*Id*. at p. 255.) There are no analogous facts here.

24

Likewise, Charlot's reliance on *Wallis v. Superior Court* (1984) 160 Cal.App.3d 1109 is of no help. In that case, the employer breached its obligation to pay an agreed upon stipend for Wallis's agreement not to compete, and Wallis asserted, among other claims, a claim for intentional infliction of emotional distress based on that breach. (*Id.* at p. 1113.) Although at first glance, such conduct seems to be little more than a breach of contract, the court noted additional allegations that made the employer's conduct sufficiently outrageous. Wallis alleged that the employer intentionally abused its position of financial control over the plaintiff by terminating payments without any good reason and lying about the reasons for such termination. Also, Wallis alleged that the defendant knew of his vulnerable position, intended to cause him harm, and that he suffered emotional distress as a result of this. (*Id.* at p. 1120.) In short, Wallis alleged that he was particularly financially vulnerable and the employer knew this fact and acted with the intent to cause him harm and emotional distress. No such financial vulnerability is alleged here.

In summary, in regard to CareFusion's direct interaction with Charlot, there are no allegations that show CareFusion's conduct was extreme and outrageous. At most, accepting Charlot's allegations as true, CareFusion lied about its reason for terminating Charlot's employment and went so far as to engage in a sham investigation. However, Charlot's allegations must be analyzed within the context of the undisputed fact that Charlot was an at-will employee. CareFusion did not need to make up a reason to terminate Charlot's employee. It simply could just fire him.

25

Further, there are no allegations that CareFusion shouted at Charlot in a rude or violent matter or called him a racial epithet while terminating him. (See *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496-497.) Nor are there any allegations that Charlot was peculiarly susceptible to emotional distress and CareFusion acted intentionally to harm him in regard to that vulnerability. (See *Wallis v. Superior Court*, *supra*, 160 Cal.App.3d at p.1120*; Executive Security Management v. Dahl* (C.D.Cal. 2011) 830 F.Supp.2d 870, 877.) We thus agree with the superior court that such allegations do not give rise to an IIED claim.[3]

Similarly, we are not persuaded by Charlot's argument that CareFusion's interactions with third parties give rise to a valid IIED claim. In the first proposed amended complaint, Charlot alleges CareFusion's conduct was extreme and outrageous because it told other employees and potential employers that Charlot engaged in bad conduct and was terminated for cause. However, when an IIED claim is based on a defendant's interaction with third parties, the conduct at issue must involve " ' "the most extreme cases of violent attack, where there is some special likelihood of fright or shock." ' " (*Christensen, supra,* 54 Cal.3d at p. 905.) Here, there are no allegations of CareFusion's conduct with third parties even remotely indicating a violent attack occurred

---

3       Moreover, in the alternative, we agree with CareFusion that even if Charlot did state a claim for IIED, it would be preempted by the California Workers' Compensation Act (Lab. Code, § 3600). Charlot's IIED claim is based on the act of termination and the acts leading up to termination. These necessarily "arise out of and occur during and in the course of employment," and therefore "[e]ven if such conduct may be characterized as intentional, unfair or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 20, 25.)

or there was any conduct giving rise to fright or shock. As such, Charlot failed to state a cause of action for IIED for this reason as well.

In summary, we determine that the superior court did not abuse its discretion in denying Charlot's motion for leave to file a first amended complaint.

II

*MOTION FOR SUMMARY JUDGMENT*

The superior court granted summary judgment, which included six causes of action. On appeal, Charlot only claims error as to two causes of action (defamation and promissory estoppel) and punitive damages. As such, we only address those two claims as well as punitive damages. In addition, Charlot challenges several evidentiary rulings in connection with the court's granting of summary judgment. We review those rulings as well.

A. Standard of Review

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Further, the pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055.)

The standard of review for an order granting a motion for summary judgment is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).)

In performing our independent review, we apply the same three-step process as the trial court. "Because summary judgment is defined by the material allegations in the

27

pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 (*Baptist*).)

"We then examine the moving party's motion, including the evidence offered in support of the motion." (*Baptist*, *supra*, 143 Cal.App.4th at p. 159.) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. (See *AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064.) Therefore, a defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o); *Aguilar*, *supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citations], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.)

28

"There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id*. at p. 850, fn. omitted.) Thus, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

Although a review of a judgment following the granting of a summary judgment requires an independent review, "[a] different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion 'de novo,' the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) This standard is guided by various principles set out in the case law: " '[T]he appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' . . . Other cases suggest that a court abuses its discretion only when its ruling is arbitrary, whimsical, or capricious." (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1218.) Here, where appropriate, we will address the various objections and the court's ruling on same within the context of the challenge to the summary judgment.

A.  Defamation

We begin by reviewing the operative complaint to frame the issues to be decided as to the defamation claim.  Here, the allegations of the operative complaint state: "[CareFusion has] defamed [Charlot] in his profession and to others within his profession and/or business.  [Charlot] is informed and believes, and based on that information and belief alleges, [CareFusion] made verbal false statements to current employees of [CareFusion] and to potential employers and/or business associates accusing [Charlot] of not being qualified, threatening employees, being incompetent in his function as a manager and in the Treasury Department.  [¶] These statements were slanderous per se as they tend directly to injure him in respect to his office, profession, trade or business."

Although couched as a cause of action for defamation in general, the allegations clearly focus on slander.  "Slander is a species of defamation."  (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 867.)  The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

Further, the allegations of the operative complaint explicitly state that Charlot is alleging a claim of slander per se.  "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1.  Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2.  Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3.  Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in

30

those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage." (Civ. Code, § 46.)

A slander claim that falls within the first four subdivisions of Civil Code section 46 is slander per se and requires no proof of actual damages. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 107.) Here, Charlot's allegations implicate subdivision (3) (occupation). In connection with subdivision (3) of Civil Code section 46, "to be actionable per se, a defamatory statement must tend 'directly' to injure the person defamed in respect to his office, profession, trade or business . . . ." (*Correia v. Santos* (1961) 191 Cal.App.2d 844, 852.)

In support of its motion for summary judgment as to the defamation claim, CareFusion offered a single undisputed material fact: "[Charlot] is unable to identify any false, unprivileged statement of fact made about him by CareFusion."

CareFusion based this fact on Charlot's multiple responses to interrogatories asking Charlot to set forth the defamatory statements in detail, including what was said, who made the statements, and to whom the statements were made. In response to the interrogatories, Charlot provided vague conclusions mirroring the allegations in the complaint: "[Charlot] believes that [CareFusion] told employees that [Charlot] had done something 'bad' and that [CareFusion] had just cause to terminate [Charlot]." "[Charlot] believes, based on information and belief, that statements were made to other employees of [CareFusion], by an authorized representative and/or employee of [CareFusion]

31

accusing [Charlot] of wrong doing, lacking qualifications, being incompetent and being a physical threat to employees of [CareFusion]."

Charlot's factually devoid answers to interrogatories were sufficient to make the initial showing that the defamation claim lacked merit. (See *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580-581.) Here, Charlot's responses show that he cannot point to any specific slanderous statement to support his claim. Thus, the burden shifts to Charlot to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849.)

In opposing the motion for summary judgment, Charlot attempted to dispute CareFusion's lone statement of undisputed material fact by relying on six sources of evidence: Charlot's supplemental responses to special interrogatories,[4] Charlot's deposition testimony, Freeman's Report, a document entitled "Talking Points," Charlot's declaration, and Hinrichs's deposition testimony. On appeal, Charlot argues the evidence shows that the allegedly defamatory statements consisted of: (1) Charlot repeating defamatory statements to prospective employers (e.g., he was terminated for cause);

---

[4]     We note that Charlot's supplemental responses to special interrogatories speak only in general terms. They do not describe who made the defamatory statement and to whom it was made. Instead, it refers to CareFusion in general telling unnamed employees that Charlot "had done something 'bad' " and CareFusion had "just cause to terminate" Charlot. The superior court sustained objections to these responses because they were hearsay and lacked foundation. Although Charlot challenges the exclusion of his supplemental interrogatory responses, we agree with the superior court's ruling. The responses are not sufficiently detailed to provide the necessary information to conduct a hearsay analysis and there is no foundation provided in the response explaining how Charlot knows he was allegedly defamed.

32

(2) statements made to the treasury department based on the talking points document; and (3) Hinrichs's statements to Morrison that Charlot had done something "bad," "wrong," or "acted in a way he should not have acted."[5]

In regard to Charlot's first theory of defamation that he had to repeat defamatory statements, we observe that the operative complaint did not include any allegations regarding this theory of defamation.  In bringing a motion for summary judgment, CareFusion "had the burden . . . of negating only those ' " 'theories of liability as alleged in the complaint' " ' and [was] not obliged to ' " ' " 'refute liability on some theoretical possibility not included in the pleadings.' " ' " ' "  (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1254 (*Conroy*).)  In addition, ["[t]he materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' "  (*Id* at p. 1250.)  Also, Charlot does not point to where he made this argument to the superior court.  Having not raised this issue with the superior court in opposing the motion for summary judgment in the first instance, we do not consider this new theory on appeal.  (See *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)

---

5    In opposing the motion for summary judgment, Charlot also maintained that certain statements made by Saundra Redmond to Ratnayake regarding the results of Freeman's investigation were defamatory.  However, in his opening brief, Charlot does not mention these statements.  As such, CareFusion did not address these statements in its respondent's brief.  Charlot discusses Redmond's statements as defamatory for the first time in his reply brief.  We need not address arguments made for the first time in a reply brief.  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894-895, fn. 10.)

33

Next, Charlot maintains the message provided to the treasury department based on the talking points was defamatory.  Although the parties agree that the talking points formed the basis of a message that was conveyed to members of the treasury department after Charlot was terminated, we find it curious that there is little else in the record explaining who was the author of the talking points, what was actually said at the treasury department meeting, and who delivered the talking points.  Charlot references an attachment to an e-mail entitled "Talking Points (Amar and Christa meeting with Treasury Group)."  However, he does not point to any other admissible evidence in the record to provide additional context or explain how the message was conveyed.  It appears the parties agree that Duvvur addressed the treasury department based on the talking points, but Duvvur's declaration, submitted by Charlot in support of his opposition to the motion for summary judgment, offered meager information regarding Duvvur's actual presentation.  Indeed, in his declaration, Duvvur declared, among other things that it was standard practice for CareFusion's human resources department to provide talking points to a manager when an employee was terminated, but he did not recall the details of how he was instructed to communicate the separation of Charlot.  This said, it appears that both Charlot and CareFusion accede that the following was said:

> "As most of you are aware, there has been an on-going investigation
> within the Treasury Department.  We have completed that
> investigation and it is now closed.  We want to reiterate that in our
> organization employees should feel comfortable to raise concerns
> internally and we will not tolerate any form of retaliation.  I also
> want to talk to you about some organization changes.  David
> [Charlot] is leaving CareFusion.  Next week we will post the
> Assistant Treasurer position and begin recruiting.  Until a new
> Director is hired, Ramon, Nish and Sean will report directly to me.

34

> This change will begin immediately. I want to thank all of you for your continued dedication and support. I will keep you posted during our recruiting process."

As a threshold matter, we observe that the talking points are not slander per se. Nothing in this statement tends to "directly" injure Charlot in respect to his profession. (See *Correia v. Santos*, *supra*, 191 Cal.App.2d at p. 852.) Indeed, only one statement in the talking points mentions Charlot: "David is leaving CareFusion." The rest of the talking points concern CareFusion's policies. As CareFusion points out here, everything stated in the talking points is true. And truth is a complete defense to a defamation claim. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 646.)

In opposing CareFusion's motion for summary judgment, Charlot argues that the defamatory statements in general are slander per se, but he does not sufficiently explain how the talking points qualify as such. In his opening brief here, Charlot appears to change tactics and insists, after considering the context of the talking points and other extrinsic factors, they are defamatory.[6]

"Where the words or other matters which are the subject of a defamation action are of ambiguous meaning, or innocent on their face and defamatory only in light of extrinsic circumstances, the plaintiff must plead and prove that as used, the words had a particular meaning, or 'innuendo,' which makes them defamatory." (*Smith v. Maldonado*, *supra*, 72 Cal.App.4th at p. 645.) Here, Charlot claims the talking points were defamatory because

---

[6]    We observe that Charlot again argues his defamation claim beyond the parameters he established with his complaint wherein he alleged the defamatory statements were slander per se.

35

they communicated, at least impliedly, that "as a result of the 'investigation,' Charlot was found guilty of wrongdoing, including 'retaliation,' and it was severe enough to warrant termination of his employment and impending replacement by a new employee." Charlot further reasons that the defamatory nature of the talking points is "made even clearer" when coupled with evidence that Charlot was escorted out of his office in view of treasury employees. Thus, Charlot agues the talking points are defamatory because, if an employee knew about the investigation of Charlot, he or she could infer from the talking points that Charlot was found guilty of wrongdoing, including retaliation, and was terminated because of his conduct. In other words, Charlot had to offer evidence of these additional facts to satisfy his burden of proving the talking points could be considered defamatory. He has not done so.

Charlot has not pointed to any admissible evidence in the record featuring a declaration from or deposition of a CareFusion employee who knew about the investigation, heard the talking points, saw Charlot escorted out of the office by security, and believed that the talking points conveyed that Charlot was found guilty of wrongdoing. Instead, Charlot points to paragraph 31 of his own declaration as the additional evidence to support his position. Paragraph 31 states in pertinent part:

> "I was told by some of my staff that a Treasury Department meeting was held and it was announced that I was no longer with CareFusion and, immediately after that news, there was a stern reminder that CareFusion does not tolerate retaliation or bullying. I was told by my staff that it was directly inferred and they believed that I was terminated for having done something wrong. They were all aware that Mr. Ratnayake complained about me and that the investigation was occurring because many of them were interviewed. I was told by some of my staff that the way the interviewer asked questions, it

36

was 'obvious' they were looking for something on me and were critical of me. . . ."

CareFusion objected to paragraph 31 of Charlot's declaration on the grounds that it was not relevant (Evid. Code, § 350), hearsay (Evid. Code, § 1200), lacked foundation (Code of Civ. Proc., §437c, subd. (d); Evid. Code, § 403), and was speculative (Evid. Code, § 702.) The court sustained the objection to the first two sentences as well as the fourth sentence of paragraph 31 on hearsay grounds and the third sentence because it lacked foundation and was speculative. Here, Charlot contends the court abused its discretion in sustaining the objections to paragraph 31 on hearsay grounds only. He argues the statements in paragraph 31 were offered for nonhearsay purposes, namely to establish publication or effect on the listener. But Charlot does not address or otherwise take issue with the court sustaining the objection based on lack of foundation and speculation as to the third sentence of paragraph 31. As such, Charlot has waived any objection to this ruling and the third sentence of paragraph 31 is not admissible for purposes of establishing a disputed issue of material fact.

In addition, we disagree with Charlot that the statements contained in paragraph 31 are not hearsay. Paragraph 31 of Charlot's declaration is based on what unnamed staff members told Charlot about what an unidentified CareFusion representative told them. Under Evidence Code section 1201, where a statement involves multiple levels of hearsay, each level must satisfy a hearsay exception for the entire statement to be admissible. Here, Charlot offers no argument that would allow the admission of the unnamed staff member's statement to Charlot. Although what the CareFusion

37

representative said at the meeting might not be hearsay because it concerns the defamatory statement and could be offered for effect on the listener or to establish publication, what the unnamed staff members said to Charlot was an out-of-court statement offered for the truth of the matter asserted, namely a CareFusion representative made certain statements in a meeting. While it is conceivable that such a statement could be admissible as a party admission (see Evid. Code, § 1220), we are unable to evaluate it as such because Charlot has failed to indicate who told him about what Duvvur said at the treasury department meeting. Accordingly, we conclude the superior court did not abuse its discretion in sustaining the objections to paragraph 31 on hearsay grounds.

Without any admissible evidence that can support Charlot's claim that the talking points were implied slander, Charlot's cause of action for defamation cannot be based on the talking points.

Finally, Charlot argues that Hinrichs's statements to Morrison that Charlot had done something "bad," "wrong," or "acted in a way he should not have acted" was defamatory. On appeal, Charlot cites to three sources of evidence to support his theory that this defamatory statement was made. The first is paragraph 32 of his declaration, which states:

> "Since my termination I have become aware from at least two people, Steve Morrison and Jim Hinrichs that CareFusion employees told other employees, including Mr. Morrison, Mr. Sean Smith, Jonathan Wygant and Jean Maschal that I was terminated because I did something bad or wrong, that CareFusion was looking for and found a 'smoking gun.' I believe Mr. Morrison was also told that I was terminated for cause because of a violation of the Code of Conduct."

38

Paragraph 32 is couched in general terms about unnamed employees telling certain identified employees allegedly defamatory statements. Although Charlot declares that he became aware of these statements from Morrison and Hinrichs, this declaration does not set forth that Hinrichs told Morrison anything about Charlot's termination. Put differently, it does not provide evidence of any defamatory statement made by Hinrichs to Morrison.[7]

Next, Charlot claims his deposition testimony establishes the allegedly defamatory statement made by Hinrichs to Morrison. Nevertheless, during his deposition, Charlot was equivocal at best that Morrison told him about the allegedly defamatory statement. Charlot testified as follows:

> "[Q.] What statements did Jim Hinrichs make about you?
>
> "A. Well, he informed Steve Morrison, for instance, that I had done something wrong, and that's why I was terminated. That the investigation found out that I had done something very wrong. Maybe strike the 'very.' I don't recall whether he said 'very.' But something that I did wrong.
>
> "Q. And Steve Morrison was an employee of CareFusion at the time that Jim told him this?
>
> "A. He was the vice president of audit.
>
> "Q. Do you know when Mr. Hinrichs made that statement to Mr. Morrison?

---

[7] CareFusion objected to paragraph 32 on several grounds, including hearsay, which the court sustained. Charlot claims the superior court abused its discretion in sustaining the objection to paragraph 32 because the statements in that paragraph were not hearsay but offered to establish the publication element of hearsay or their effect on the listener. However, we need not resolve this dispute because paragraph 32 does not offer evidence of the alleged defamatory statement Charlot claims was said by Hinrichs to Morrison.

"A. No.

"Q. When did you hear about it?

"A. I don't know. At least six months ago.

"Q. From Mr. Morrison?

"A. I don't recall.

"Q. So you don't recall who told you that?

"A. That's correct. I believe he may have mentioned it to me. And I think it might have been mentioned elsewhere as well."

Therefore, Charlot's deposition testimony sets forth the basic substance of the allegedly defamatory statement and who said it to whom. However, it is clear that Charlot was not present when Hinrichs made the statement to Morrison. Further, Charlot admits that he cannot recall if it was Morrison who told him about the statement.

CareFusion objected to this deposition testimony on numerous grounds, including hearsay. The superior court sustained the objection. Charlot now contends the court abused its discretion in sustaining the objection because the statement was not hearsay. However, like paragraph 31 of Charlot's declaration, there exists a double hearsay problem. The first statement is what Hinrichs said to Morrison. It would not be hearsay because it would not be offered for the truth of the matter asserted. However, someone told Charlot about what Hinrichs said and it is that statement that would be hearsay. It would be an out-of-court statement offered for the truth of the matter asserted. Charlot argues it is not offered for the truth of the matter asserted, but merely to establish publication. Not so. The subject statement about what Hinrichs said to Morrison was

40

made to Charlot. So the statement made to Charlot in essence is, "Hinrichs told Morrison that you were terminated because you did something wrong." So the statement had to be true (that Hinrichs told Morrison something about Charlot). If the statement was not true, it would not show that anything defamatory was said. In other words, the "truth" of the statement made to Charlot was not whether Charlot did something wrong, but that Hinrichs actually told Morrison that Charlot did something wrong. So the second statement made to Charlot was hearsay and not admissible.[8]

Lastly, Charlot relies on Hinrichs's own deposition testimony as proof that a defamatory statement was made. Yet, during his deposition, Hinrichs specifically denied that he ever told anyone that Charlot did something wrong or bad or that a smoking gun had been discovered in the investigation. Instead, Hinrichs explained that Morrison, "who was head of audit and also had compliance," was "pushing very hard" for Hinrichs to tell him what had happened with Charlot. Hinrichs believed that Morrison wanted to know about Charlot's termination for compliance issues. During his deposition, Hinrichs testified that he told Morrison, "[A]ll you need to know is no compliance matter was involved. David has been terminated and that's all you need to know. [¶] I don't know exactly what I said to him. I may have said something like, you know, David -- it's not a compliance issue, but David acted in [a] way he shouldn't have acted and he's been let

---

[8]    To the extent Charlot is arguing that the statement made to him would be a party admission and thus admissible under Evidence Code section 1220, we note that Charlot's deposition testimony does not provide a basis for making this determination. He cannot remember who told him what Hinrichs had said to Morrison. Without this crucial bit of information, we cannot determine if it was a party admission and admissible under Evidence Code section 1220.

41

go." Hinrichs further elaborated that Morrison "was a senior member of my staff, a vice president of internal audit at CareFusion, and he was pushing very hard. And I remember having a conversation with him about it."

Hinrichs's deposition testimony therefore does not establish that he told Morrison that Charlot had done something bad or wrong. At most, Hinrichs testified that he might have told Morrison "something like" Charlot was not terminated for a compliance issue, but "acted in [a] way he shouldn't have acted." Yet, even if we assume Hinrichs made a statement like this, Charlot has not shown a triable issue of fact as to his defamation claim because such a statement would be protected by the common interest privilege.

The common interest privilege is codified in Civil Code section 47, subdivision (c)(1), which provides that certain communications between parties who have shared interests are subject to a qualified privilege and therefore are not actionable as defamation. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914; *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1369.) Specifically, Civil Code section 47, subdivision (c)(1) sets forth in relevant part that a publication or broadcast is privileged if made: "(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

"This common interest privilege is not well-defined, but it has been determined to apply to statements by management and coworkers to other coworkers explaining why an

42

employer disciplined an employee." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538 (*McGrory*); see *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846 (*Deaile*); *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 440 (*King*).) "Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past." (*Deaile*, *supra*, at p. 849.)

A shifting burden generally applies to establish the common interest privilege defense. The defendant bears the initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bears the burden of proving the defendant made the statement with malice. (*Lundquist v. Ruesser* (1994) 7 Cal.4th 1193, 1210-1214.)

Here, CareFusion moved for summary judgment based on the argument that Charlot could offer no admissible evidence of a defamatory statement. In opposition, Charlot attempted to dispute this issue by providing evidence of the allegedly defamatory statements. In addition, because the allegedly defamatory statements were made to CareFusion employees, Charlot addressed the common interest privilege. To this end, Charlot argued there was not a common interest between Morrison and Hinrichs because

43

Morrison was not a member of the treasury department and did not need to know why Charlot was terminated. Also, without any citation to evidence, Charlot maintained that Hinrichs made the statement with "reckless disregard for the truth."

In reply, CareFusion provided evidence that any statements made from Hinrichs to Morrison regarding Charlot's termination were protected by the common interest privilege because Morrison had an interest in knowing the reason for Charlot's termination in case his termination concerned a compliance issue. In addition, CareFusion offered evidence that Hinrichs had a reasonable belief that what he told Morrison was true. Thus, even though it was Charlot who first raised the issue of the common interest privilege in his opposition, both parties were able to present evidence and address the common interest privilege.

On appeal, CareFusion points out that Charlot, in his opening brief, does not address the application of the common interest privilege to Hinrichs's statements to Morrison. In his reply brief, however, Charlot responds to the privilege argument, contending CareFusion has not shown that it was necessary for Morrison to know why Charlot was terminated. Also, Charlot insists he has raised a triable issue of fact regarding whether malice existed. We reject Charlot's contentions.

The evidence in the record shows that at the time Hinrichs spoke with Morrison about Charlot's termination, Morrison was CareFusion's vice-president of internal audit and a senior member of Hinrichs's staff. Morrison pushed "very hard" for information about Charlot's termination. Hinrichs did not share many details, but told Morrison that there were no compliance issues. In addition, Hinrichs testified that he might have said

44

Charlot "acted in a way he shouldn't have acted and he's been let go." Charlot's only argument that this statement was not privileged is that Morrison was not a member of CareFusion's treasury department; thus, he had no reason to know the information. Charlot, however, offers no authority to support such a limited view of which employees would qualify as "interested" under the common interest privilege. Here, we see no reason why the chief financial officer of a company could not tell a senior member of his staff that the assistant treasurer had been terminated for acting in a way he should not have acted. This seems to go to the very core of the common interest privilege and its application in the workplace to statements by managers and coworkers. (See *McGrory*, *supra*, 212 Cal.App.4th at p. 1538; *King*, *supra*, 152 Cal.App.4th at p. 440; *Deaile*, *supra*, 40 Cal.App.3d at p. 846.) Charlot's position that an interested person must be a member of the same department of the terminated employee lacks any support.

Having concluded that Morrison was sufficiently interested under the common interest privilege, we next consider whether there is a triable issue of fact as to the existence of malice. We note that on appeal Charlot takes issue with any burden shifting on summary judgment. Citing *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686 at page 729, Charlot argues that for purposes of a motion for summary judgment, a defendant bears the burden as to both components of the common interest privilege, and thus, must produce evidence that the statement was made on a privileged occasion and without malice. Although this portion of *Mamou* appears to be at odds with other California authority, Charlot's point here is moot. As we discuss above, Charlot raised the issue of the common interest privilege for the first time in his opposition to the

motion for summary judgment. He discussed the issue of malice then. In its reply, CareFusion addressed the common interest privilege and malice as well. Simply put, there is sufficient evidence in the record on the issue of malice to allow us to determine if a triable issue of material fact as to the existence of malice exists.

Malice may not be inferred from the mere fact of the communication. (See *Terry v. Davis* (2005) 131 Cal.App.4th 1534, 1558.) " '[M]alice,' within the meaning of Civil Code section 47, subdivision (c), is " ' "established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights . . . ." ' " (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1121, original italics; see *Noel v. River Hills Wilsons, Inc, supra,* 113 Cal.App.4th 1363, 1371 [mere negligence, in the sense of oversight or unintentional error, is not enough to constitute malice].)

During his deposition, Charlot admitted he did not know if Hinrichs had any ill will against him when Hinrichs made the alleged defamatory statements. In addition, Charlot testified that he was not aware if Hinrichs made the statements about Charlot's termination to Morrison while not believing the statement was true. During Hinrichs's deposition, he testified that he questioned the factual findings of the Freeman Report, but after considering various e-mails and letters, he came to the conclusion that Charlot had done something wrong. Although Charlot attacks Hinrichs's deposition testimony as evidence that Hinrichs "was simply following CareFusion's 'company line,' " he fails to point to any evidence in the record that creates a triable issue of material fact that

Hinrichs lacked reasonable grounds to believe the truth of the statement, "Charlot acted in a way he shouldn't have acted and he's been let go." Instead, Charlot attacks the Freeman Report and investigation, arguing that it was not reasonable to rely on the report. But, even if we accept Charlot's argument, there is no indication in the record that Hinrichs relied solely on the Freeman Report in determining that Charlot did something wrong. Hinrichs testified that he had reviewed certain e-mails that led him to believe Charlot acted inappropriately, "I recall seeing e-mails written to [Ratnayake] from [Charlot] that were demeaning and unprofessional, for lack of a better word."

In short, to the extent Hinrichs told Morrison that Charlot acted in a way he should not have acted, or even conveyed that Charlot had done something wrong or bad, it is protected by the common interest privilege. Charlot has not raised a triable issue of material fact as to this issue.[9]

### C. Promissory Estoppel

The elements of a promissory estoppel claim are "(1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.' " (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692.)

---

[9] In regard to the allegedly defamatory statements made to the treasury department, even if we were to determine there existed a disputed issue of material fact regarding whether the statements based on the talking points were impliedly defamatory, they too would be covered by the common interest privilege. They were made by a senior manager to employees about another member of the department as well as departmental policies. (See *McGrory*, *supra*, 212 Cal.App.4th at p. 1538; *King*, *supra*, 152 Cal.App.4th at p. 440; *Deaile*, *supra*, 40 Cal.App.3d at p. 846.)

In the operative complaint, Charlot based his claim for promissory estoppel on CareFusion's alleged promises that Charlot "would be employed long enough to enjoy the benefits" of certain bonuses and equity grants. In addition, he claimed that he was induced to leave his former employment, sell his home in New Jersey, and move his family to San Diego.

In its motion for summary judgment, CareFusion offered six undisputed material facts, all of which were aimed at establishing Charlot was an at-will employee of CareFusion and he did not rely on any specific promise to relocate to San Diego. The superior court found that Charlot did not raise a triable issue of fact that CareFusion made him a clear promise or that he could rely on any promise that he was anything but an at-will employee. Thus, the superior court concluded Charlot's promissory estoppel claim could not survive summary judgment.

On appeal, Charlot does not challenge this conclusion. Instead, he argues a theory that was not pled in the complaint. He claims that he relied on CareFusion's representations and advice to his detriment. More specifically, he argues that he sought advice and direction from CareFusion's management team regarding how to address Ratnayake as a problematic employee and then was terminated after following that advice.

As we observe above, a summary judgment is defined by the material allegations in the pleadings. (*Baptist, supra,* 143 Cal.App.4th at p. 159.) In opposition to the motion for summary judgment, Charlot raised a completely new theory, nowhere alleged in the complaint, to defeat a motion for summary judgment. The superior court would have

48

been well within its discretion to ignore these new allegations. (See *Conroy*, *supra*, 45 Cal.4th at p. 1254.) Nevertheless, the court addressed Charlot's argument on the merits and found that these new allegations did not alter Charlot's status as an at-will employee. Thus, Charlot could not show detrimental reliance.

Because the court addressed the merits of Charlot's new theory and the parties did so as well in the briefs before us, we also will consider this new theory. That said, the record is clear that Charlot was an at-will employee. Charlot does not argue otherwise. And he does not provide any evidence of a clear promise made by CareFusion or evidence that he justifiably relied on a promise that he would not be terminated if he took a certain action. Thus, he has not shown that a triable issue of material fact exists as to any of the elements of promissory estoppel. (See *Toscano v. Greene Music*, *supra*, 124 Cal.App.4th at p. 692.)

### D. Punitive Damages

Punitive damages are recoverable "[i]n an action for breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. (Civ. Code, § 3294; *see Basich v. Allstate Insurance Co.* (2001) 87 Cal.App.4th 1112, 1121.) Here, Charlot claims the superior court erred in not reaching whether he was entitled to punitive damages because it found all of Charlot's claims were without merit. Charlot insists his claim for defamation as well as his potential claim for fraud support punitive damages. We disagree.

As we have determined that no triable issue of material fact exists as to the defamation claim and the court did not err in denying Charlot's motion for leave to amend the complaint to state a claim for fraud (among other claims), there is no "breach of an obligation" on which an award of punitive damages could rest. As such, we find no error in the court's failure to reach the punitive damages issue on summary judgment.

III

*EVIDENTIARY OBJECTIONS*

Charlot's final challenge to the judgment is that the court abused its discretion in sustaining multiple objections to evidence he submitted in support of his opposition to the motion for summary judgment. We addressed certain objections regarding the alleged defamatory statements above. The remaining objections fit into four categories: (1) relevance; (2) assuming facts not in evidence; (3) lack of foundation; and (4) hearsay.

Charlot claims that the trial court abused its discretion in excluding the majority of his declaration on relevancy grounds. Charlot depicts this evidence, consisting of various paragraphs of his declaration, as describing his initiation of employment with CareFusion, the success of the treasury department (including special recognition for Charlot), Charlot's and Duvvur's interactions with Ratnayake, Ratnayake's response to a warning letter he received, and Freeman's investigation. Charlot then reasons, without explanation, that the excluded evidence was relevant to his claim that CareFusion acted negligently or with reckless disregard for the truth when it communicated the reason for Charlot's termination to Charlot and the treasury department and when Hinrichs told

50

Morrison why Charlot had been terminated. Alternatively stated, Charlot insists the evidence is relevant to his defamation claim. We are not persuaded.

At the heart of Charlot's argument is that he was an excellent employee and CareFusion created a reason to terminate his employment and did so under the guise of a bogus investigation. Charlot, however, overlooks the fact that he was an at-will employee and CareFusion did not need a reason to terminate his employment. He does not argue that any of the evidence excluded on relevancy grounds transformed the terms of his employment to something other than at will. In addition, he does not explain how the evidence creates a triable issue of fact as to any of the allegedly defamatory statements.

As best we can ascertain, Charlot maintains that the excluded evidence creates a triable issue of fact as to the reasonable belief of Duvvur in delivering the talking points and Hinrichs in making a statement to Morrison. Yet, none of this evidence has any bearing regarding what Duvvur or Hinrichs believed.

Charlot appears to argue that the evidence excluded on relevancy grounds goes to the reasonableness of Duvvur's belief in the statements he made to the treasury department. The only evidence of what Duvvur said is the talking points themselves. There is nothing in the evidence excluded on relevancy grounds that supports the assertion that Duvvur did not believe what he conveyed to the treasury department. Indeed, Duvvur's declaration, which Charlot submitted in support of his opposition to the motion for summary judgment, falls short of declaring that Duvvur did not have a reasonable belief in the talking points. In fact, the talking points are true and do not

51

contain any defamatory statement about Charlot. Further, the talking points do not discuss the results of the Freeman investigation. And Charlot does not explain how the evidence excluded as irrelevant could possibly show the talking points were defamatory. In short, Charlot has not carried his burden in showing that the court abused its discretion in excluding much of his declaration on relevancy grounds.

Next, Charlot contends the court abused its discretion in sustaining an objection to paragraph seven of his declaration on the grounds that the statements assume facts not in evidence. The subject evidence consists of Charlot's statement that he was told he would enjoy "endless opportunities" with CareFusion and that "[w]hile no one ever promised the career would be for a specified period of time, [he] was certainly told that CareFusion intended to have a long-term relationship with [him]." He further declared that he "took the position at CareFusion believing what [he] was told, that [he] would have a long-term career at CareFusion."

In superior court, Charlot offered this evidence as an additional disputed material fact in opposition to the motion for summary judgment. He did not specifically reference a particular cause of action to which this evidence applied. Nor does he do so in his opening brief here. In reviewing the record, it appears Charlot referenced this evidence in regard to his discussion of his promissory estoppel claim that he relied on certain representations from CareFusion to quit his job in New Jersey and move to San Diego to work for CareFusion. However, on appeal, Charlot has abandoned this theory of promissory estoppel by failing to address it in his opening brief. Instead, he focuses on a new theory of promissory estoppel in that he relied on advice from CareFusion regarding

52

how to manage Ratnayake. Accordingly, the evidence about why he took the job with CareFusion does not appear to be applicable to any issue challenged by Charlot here. Thus, we determine Charlot's challenge to the exclusion of this evidence is moot.

In addition, Charlot asserts the court abused its discretion in sustaining objections to certain evidence on the grounds that it lacked foundation. Specifically, Charlot takes issue with the court excluding portions of paragraphs 30 and 33 through 35 of his declaration.

In paragraph 30, the court sustained an objection for lack of foundation to the following sentence: "The Code of Conduct is a lengthy document modeled to prohibit unethical behavior such a stealing, bribes, embezzlement and harassment." However, Charlot does not point to anywhere in the record where he established that he authored, read, or was otherwise familiar with the contents of the code of conduct. Thus, we find that the court did not abuse its discretion when it sustained the objection to paragraph 30.

In regard to paragraph 33, Charlot declared that corporate treasury work is sensitive and important. He also states that only terminations as part of reductions in force are "commonly acceptable to potential employers." Charlot is offering this evidence in an attempt to explain why he cannot obtain another job since he was terminated by CareFusion. Therefore, he is attempting to explain other companies' respective approaches to hiring candidates and why they would not hire him. Moreover, he is basing his statements on previous sentences in paragraph 33, which were also excluded on other grounds and not challenged by Charlot. These previous sentences provide some context for Charlot's assertions, namely they detail conversations Charlot

53

had with potential employers. However, because they were properly excluded, Charlot has not provided the proper foundation to allow him to discuss the reasons he believes potential employers are not hiring him and what they are looking for in candidates. The court did not abuse its discretion in excluding this evidence.

The evidence excluded from paragraph 34 is Charlot's statement regarding what a company is concerned about when interviewing him for a potential job and why it is important to those companies that he would be forthcoming. Again, Charlot does not lay the foundation how he could know what the companies where thinking or what they wanted while interviewing him. We agree with the superior court that sufficient foundation was not provided.

Also, we determine the court did not abuse its discretion in sustaining CareFusion's objection to paragraph 35 of Charlot's declaration for lack of foundation. In that paragraph, Charlot offers information about the value of equity grants that he lost as well as opining that he had completed his fiscal 2012 goals and milestones to receive his annual bonus. Charlot has failed to point to anywhere in the record where he provided the necessary foundation to properly value the equity grants or indicate the various goals and milestones that he was supposed to achieve and had achieved. Without this foundation, his statements were merely conclusions. We again agree with the superior court in excluding this evidence.

Finally, Charlot takes issue with a couple of objections to the declaration of Colleen Hulce, who is a professional recruiter, working with Charlot. The court sustained CareFusion's objection for lack of foundation as to Hulce's ultimate opinion

that Charlot cannot find employment since he was terminated from CareFusion because he was terminated for cause. On the record before us, we find that the court did not abuse its discretion in excluding this evidence. There is not a sufficient foundation of admissible evidence that allows Hulce to reach this opinion. Charlot does not indicate where the foundation was provided except to rely on Hulce's stated "expertise." This is not enough. (See *McGonnell v. Kaiser Gypsum Co., Inc.* (2002) 98 Cal.Appp.4th 1098, 1106 ["Plaintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning."].)

Likewise, we are not impressed by Charlot's challenge to the court excluding a portion of Hulce's declaration on hearsay grounds. Hulce declared: "Both employers were impressed with David Charlot's background but demanded specific details regarding the circumstances of his departure from CareFusion. Both decided to pass on Mr. Charlot's candidacy. His termination was the only material, negative factor discussed by the employers." Charlot argues the excluded evidence is not hearsay, but Hulce's assessment of facts based on personal knowledge and interaction with employers regarding Charlot's candidacy. We disagree. Hulce is not providing an assessment of facts, but merely repeating what allegedly she was told by two potential employers. As such, she is not providing an opinion based on hearsay, but instead, trying to introduce out-of-court statements for the truth of the matter asserted. The court did not abuse its discretion in excluding this evidence.

55

DISPOSITION

The judgment is affirmed.  CareFusion is awarded its costs on appeal.


                                                        HUFFMAN, Acting P. J.

WE CONCUR:


          NARES, J.


          McDONALD, J.